Schuyler G. Carroll, Esq.
Robert M. Hirsh, Esq.
ARENT FOX LLP
1675 Broadway
New York, New York 10019
(212) 484-3900

Counsel for the Official Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------

| | |
|---|---|
| **In re** <br><br> **BH S&B HOLDINGS LLC**, *et al.*[1], <br><br> **Debtors.** | **Chapter 11** <br><br> **Case No 08-14604 (MG)** <br> **(Jointly Administered):** |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, on behalf of **DEBTORS**, Plaintiff <br><br> vs. <br><br> BAY HARBOUR MASTER LTD.; <br> TROPHY HUNTER INVESTMENTS, LTD.; <br> BH S&B INC.; <br> BAY HARBOUR MANAGEMENT LC; <br> YSOF S&B INVESTOR LLC; <br> YORK SPECIAL OPPORTUNITIES FUND, L.P.; <br> YORK SPECIAL OPPORTUNITIES FEEDER FUND (CAYMAN), L.P.; <br> YORK CAPITAL MANAGEMENT, L.P.; <br> BHY S&B HOLDCO, LLC; <br> HILCO SB LLC; <br> BH S&B FINCO, LLC; | Adv. No. _____ <br><br><br> **COMPLAINT** |

---
[1] The Debtors are: BH S&B Holdings LLC; BHY S&B Intermediate Holdco LLC; BH S&B Retail LLC; BH S&B Lico LLC; Heritage Licensing LLC; Fashion Plate Licensing LLC; Cubicle Licensing LLC; and BH S&B Distribution LLC.

DOUGLAS PAUL TEITELBAUM;
SCOTT SOZIO;
LUIS MEDEIROS;
JAMES G. DINAN;
STEVEN ADAM SHORE;
BARRY J. PREVOR;
GARY SUGARMAN; and
ANDREW TODD.

Defendants

COMES NOW the Official Committee of Unsecured Creditors (the "Committee"), on behalf of the Debtors, **BH S&B HOLDINGS LLC,** *et al*., (collectively, "Plaintiff"), by and through counsel for the Committee, Arent Fox LLP, and for Plaintiff's Complaint against the Defendants alleges as follows:

**Parties**

1. Plaintiffs are the Debtors in this bankruptcy case. For purposes of this Complaint, the lead Debtor is BH S&B Holdings LLC ("Lead Debtor" or "Debtor") (Lead Debtor is owned by BHY S&B Intermediate Holdco LLC and is the sole managing member of BH S&B Retail LLC, BH S&B Distribution LLC and BH S&B Lico LLC.)

2. Defendant Bay Harbour Management LC is a Florida Limited Liability Company. On information and belief it maintains offices at 375 Park Ave., 20th Floor, New York, New York.

3. Defendant Bay Harbour Master Ltd. is a Cayman Islands entity, and, on information and belief, maintains offices at 375 Park Ave., 20th Floor, New York, New York.

4. Defendant Trophy Hunter Investments Ltd. is a Florida limited Partnership. On information and belief, it maintains offices at 885 3rd Ave., 34th Floor, New York, New York.

5. Defendant BH S&B, Inc. is a Delaware Corporation. On information and belief, it maintains offices at 375 Park Ave., 20th Floor, New York, New York.

6. Defendant York Capital Management L.P. is a Delaware Limited Partnership. On information and belief, it maintains offices at 767 Fifth Ave., 17th Floor, New York, New York.

7. Defendant YSOF S&B Investor LLC ("York") is a Delaware Limited Liability Company with offices at York Capital Management, 767 Fifth Avenue, 17th Floor, New York, New York.

8. Defendant York Special Opportunities Fund L.P. is a Delaware Limited Partnership. On information and belief, it maintains offices at York Capital Management, 767 Fifth Avenue, 17th Floor, New York, New York.

9. Defendant York Special Opportunities Feeder Fund (Cayman) L.P. is a Cayman Islands Limited Partnership. On information and belief, it maintains at York Capital Management, 767 Fifth Avenue, 17th Floor, New York New York.

10. Defendant BHY S&B Holdco LLC ("Holdco") is a Delaware Limited Liability Company with offices at 375 Park Ave., 20th Floor, New York, New York.

11. Defendant Hilco SB LLC ("Hilco") is a Delaware Limited Liability Debtor with offices at 5 Revere Drive, Suite 206, Northbrook, Illinois.

12. Defendant BH S&B Finco LLC ("Finco") is a Delaware Limited Liability Company with offices at 375 Park Ave., 20th Floor, New York, New York.

13. On information and belief, Douglas Teitelbaum ("Teitelbaum") is a resident of New York.

14. On information and belief, Scott Sozio ("Sozio") is a resident of New York.

15. On information and belief, Luis Medeiros ("Medeiros") is a resident of New York.

16. On information and belief, James G. Dinan ("Dinan") is a resident of New York.

17. Defendant Steven Adam Shore ("Shore") is a resident of New York.

18. Defendant Barry J. Prevor ("Prevor") is a resident of New York.

19. Defendant Gary Sugarman ("Sugarman") is a resident of New York.

20. Defendant Andrew Todd ("Todd") is a resident of the state of New York.

### Jurisdiction and Venue

21. This Complaint arises under and relates to a case under Title 11 of the United States Code, and the Court has jurisdiction pursuant to 28 U.S.C. §1334.

22. Venue is properly in this Court pursuant to 28 U.S.C. §1409.

23. This is a core proceeding pursuant to 28 U.S.C. §157.

### General Allegations

24. Pursuant to an Amended and Restated Asset Purchase Agreement ("APA") dated as of August 21, 2008, the Debtor purchased the majority of assets and liabilities of S&B Industries, Inc., which together with its affiliates was operating under Title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (Case No. 08-12579 (ALG) (the "first Bankruptcy

Case.") The Bankruptcy Court in the first Bankruptcy Case entered an order on or about August 22, 2008 approving the APA.

25. S&B Industries Inc. was the direct or indirect parent of assorted subsidiaries, the debtors in the first Bankruptcy Case (collectively, "Steve and Barry's), which together comprised the Steve and Barry's business, which at the time of the bankruptcy maintained approximately 276 stores in 39 states selling licensed university apparel and lifestyle brands; private label casual clothing and accessories for men, women and children; and exclusive celebrity branded lines of apparel and accessories. The corporate offices of Steve and Barry's were located in Port Washington, New York.

26. The Steve and Barry's business model was to offer quality apparel and accessories at lower prices than typically found for similar goods from other specialty retailers.

27. As described in the Affidavit of Chief Operating Officer Gary Sugarman ("First Day Affidavit") filed July 9, 2008 in the first Bankruptcy Case, Steve and Barry's filed bankruptcy due to a liquidity crisis that it attributed to "a host of factors" including delayed store openings, delayed receipts of tenant allowances, and reduced borrowing capacity arising from inventory appraisal reductions, all exacerbated by the "instability in the financial and credit climates" in mid 2007 and the related tightening of credit by lenders, including Steve and Barry's lenders.

28. Defendant Teitelbaum formed the Debtor, BH S&B Holdings, LLC, on behalf of the Defendants identified in paragraphs 2 through 5 above (collectively "Bay Harbor"), which on information and belief are all affiliated and acted in concert at all material times, for the purpose of entering into the APA, liquidating a portion of Steve

and Barry's retail stores, and continuing to operate the remaining stores and related business as a going concern.

29. Holdco was in turn formed by Bay Harbour to serve as a holding company for the Debtor, and was its sole managing Member.

30. The purchase price for the acquisition of Steve and Barry's by the Debtor was $163,000,000, subject to verification that the aggregate cost value of merchandise purchased was $183,700,000, and adjustment of the purchase price by an amount equal to 83% of the difference between this price and the actual aggregate cost value of the merchandise as determined in accordance with the APA.

31. The Debtor was capitalized by a $125,000,000 short-term (18 months) loan from Abelco Finance LLC ("the Abelco Loan"), payable on demand, and $100,000,000 in capital contributions, as set forth below.

32. The following Capital Contributions were made to Holdco for contribution to the Debtor: $35,000,000 from Bay Harbour; $35,000,000 from one or more of the Defemdamts identified in paragraphs 6 through 9 (collectively, "York"), which, on information and belief, are all affiliated and acted in concert at all material times; $10,000,000 from Hilco; and $10,000,000 each from Shore and Prevor.

33. Hilco had initially sought to acquire Steve and Barry's merchandise for liquidation, and was persuaded to join Bay Harbour's bid in exchange for the right of Hilco affiliates to handle liquidation of the stores that Bay Harbour did not intend to keep open.

34. Prevor and Shore were pressured at the last minute to contribute equity in exchange for Bay Harbour's agreement to waive an unsatisfied condition to closing on the APA (related to renegotiation of leases.)

35. At Bay Harbour's direction, Holdco contributed $25,000,000 of the Capital Contributions to Debtor, and contributed the remaining $75,000,000 of the Capital Contributions to Holdco to its affiliate, Finco, which then entered into subordinated second lien facility with the Debtor in the same amount (the "Finco Loan.")

36. The governing structure of Holdco, which controlled the Debtor, consisted of a seven-member Board of Managers, consisting of two representatives of Bay Harbour (Defendants Teitlebaum and Sozio, collectively the "Bay Harbour Board Members"); two representatives of York (Defendants Medeiros and Dinan, collectively the "York Board Members"); one representative of Hilco, Jeffrey Hecktman, and Defendants Prevor and Shore.

37. The business plan for operating the Steve and Barry's business going forward consisted of the following principal elements:

    a. Operate 153 stores on a going-forward basis, and liquidate the remaining stores;

    b. Renegotiate the leases for the going-forward stores (accomplished in part prior to closing);

    c. Replace senior management;

    d. Procure new and fresh merchandise for going-forward stores;

    e. Benefit from the migration of customers to lower-priced apparel due to the economic downturn;

f. Improve profitability through more "tiers" of pricing;

g. Increase the percentage of merchandise representing celebrity licensed apparel;

h. Improve the frequency of inventory turnover;

i. Reduce fixed and operating costs;

j. Move to a "piece pick" method of shipping inventory from Steve and Barry's distribution center; and

k. improve the Steve and Barry's computer systems.

38. Elements "f" through "k" in the preceding paragraph were long-term goals; however, items "a" through "e" were near-term goals. In particular, it was critical in the near-term for the Debtor to obtain new and fresh merchandise for the going-forward stores. The Debtor estimated that it needed in excess of $100 million in merchandise for this purpose.

39. The Debtor's plan was to acquire the necessary merchandise from the following sources:

a. $32 million in merchandise held at the port on account of the first Bankruptcy Case;

b. $25 million in merchandise from domestic sources (principally T-Shirts)

c. $20 million in merchandise ready to be shipped overseas;

d. $15 million in materials purchased by vendors but not yet manufactured; and

e. $15 million in inventory from liquidating stores.

40. Fresh inventory from liquidating stores was to be identified and transferred to going-forward stores.

41. At the same time, stale inventory from going-forward stores was to be transferred to liquidating stores.

42. The funds to purchase new inventory were to come from working capital and existing sales of merchandise at going-forward stores and liquidating stores. However, of the $225,000,000 total capitalization of the Debtor, $163,000,000 was expended to purchase the Steve and Barry's business, $7,000,000 was allocated to transaction costs, $15,000,000 was to be reserved as a cash cushion, and only $40,000,000 was set aside for inventory purchases.

43. Moreover, funds actually available for inventory purchase were even less than would otherwise have been the case because Bay Harbour's plan was to quickly pay down the Abelco Loan and refinance it, and if not paid down, the Abelco Loan was subject to demand and/or conversion to a revolving loan at reduced amounts.

44. Absent pay down and refinance, Bay Harbour and Abelco had agreed that the Abelco Loan would be converted to a revolving loan that would be reduced to $105,000,000 90 days after closing; to $85,000,000 121 days after closing; and $65,000,000 from the 150th day after closing through maturity.

45. Additionally, by agreement with Abelco, the contemplated revolving loan was subject to further reduction equal to the lesser of 70% of the domestic eligible inventory or 80% of the appraised net orderly liquidation value of inventory.

46. In September and October 2008, sales at going-forward stores were less than anticipated because the Debtor's management failed to obtain the new merchandise

necessary to drive sales; failed to accomplish timely and effective transfer of merchandise from liquidating stores to going-forward stores; and failed to timely and appropriately transfer merchandise from the Debtor's distribution center to individual stores, resulting in insufficient merchandise and poor selection in the majority of Steve and Barry's stores.

47. In September and October 2008, sales at liquidating stores were less than anticipated primarily because the quality of the inventory to be liquidated was less than anticipated.

48. As of October 4, 2008, the Debtor had sold $33,500,000 in inventory but had only purchased $9,000,000 of new merchandise.

49. On or about October 14, 2008, the Abelco Loan was converted to a revolving loan. (At the same time, Debtor BHY Intermediate Holdco LLC was interposed as an intermediate holding Debtor of the Debtor.)

50. On or about October 14, 2008, as a result of the reduced value of the existing inventory, Abelco reduced the value of its loan, resulting in a sweep of $28,500,000 from the Debtor's cash accounts.

51. Although the Debtor continued to have cash on hand even after the Abelco sweep, Bay Harbour and York never permitted the Debtor to order new merchandise for the Spring 2009 season. (There were two selling seasons for Steve and Barry's: Fall and Spring.)

52. By early November 2008, as a direct consequence of the failure of the Debtor's management to procure new merchandise for going-forward stores, its failure to accomplish the timely and effective transfer of inventory between going-forward and liquidating stores, its failure to accomplish the timely and effective transfer of

merchandise from the Debtor's distribution center to individual stores, the sweep of cash by Abelco based upon inventory valuation, and the lack of sufficient capital available to the Debtor to overcome these circumstances, Bay Harbour and York concluded that the Debtor required additional capital to continue as a going concern.

53. At that time, Bay Harbour and York considered contributing the additional capital necessary for the Debtor to remain in business but elected instead not to do so.

54. Accordingly, beginning in early November, Bay Harbour and York began planning for the Debtor's bankruptcy, culminating in the Debtor's bankruptcy filing on November 19, 2008.

### COUNT I: PIERCING OF CORPORATE VEIL
**(Against the Bay Harbour, York, Teitelbaum, Sozio, Medeiros and Dinan)**

55. Plaintiff hereby reallages and incorporates paragraphs 1 through 54 above as if fully set forth herein.

56. From the beginning, the Bay Harbour Board Members and the York Board Members dominated and controlled the Debtor for the benefit of Bay Harbour and York as if the Debtor was merely an instrumentality of Bay Harbour and York.

57. No Board meetings were ever held. Rather, Holdco and in turn the Debtor were managed by "consensus" of the Bay Harbour and York representatives, without consultation of the other Board Members.

58. The Debtor had no official Chief Executive Officer ("CEO") until Hal Kahn was hired in the latter half of October, 2008, and Mr. Kahn was given no substantial authority for the short time period between his hiring and the decision by Bay Harbour and York in early November to prepare the Debtor for a bankruptcy filing.

11

59. At all times Bay Harbour acted as the CEO, conveying the executive decisions of Bay Harbour and York to the Debtor's executives through Teitlebaum or Sozio.

60. The Debtor had no Chief Financial Officer. Instead, the consulting firm of JH Cohn was retained by Teitlebaum to perform CFO services directly for the Debtor's Board.

61. The Bay Harbour Board Members, with the consent of the York Members, made all strategic decisions of the Debtor, and, through JH Cohn, exercised strict control over the expenditure of funds by Debtor's management.

62. The Debtor was not adequately capitalized for its known financial needs, nor for any risks to its business plan, including the following:

    a. There was not adequate cash set aside for the Debtor's merchandise needs;

    b. The Abelco Loan was susceptible of demand or conversion to a revolving loan in a reduced amount at any time;

    c. There was no sound basis for assuming that the existing inventory could be liquidated for the proceeds assumed;

    d. There was no coherent plan for acquiring merchandise for the Fall season from the ports, given the competing interests and liens on such merchandise resulting from the first Bankruptcy Case;

    e. There was no coherent plan for acquiring merchandise for the Fall season from other sources;

    f. There was no coherent plan for moving merchandise between

liquidating and going-forward stores.

63. From the beginning, Bay Harbour and York had a secret back-up plan to liquidate the Debtor starting in December 2008 if sales did not go well in September, October and November, 2008.

64. From the beginning, Bay Harbour and York failed to authorize any substantial expenditure of monies on merchandise for the Spring 2009 season.

65. Throughout September and October 2008, the Debtor continued to incur obligations to creditors without disclosing to creditors that no monies were being expended to continue as a going concern past year end, and that, instead, Bay Harbour and York had a secret backup plan to liquidate the Debtor beginning in December 2008 if their arbitrary and unproven assumptions concerning their plans to operate the Steve and Barry's business in September and October 2008 proved inaccurate.

66. Neither the Debtor's management nor Shore and Prevor were advised of Bay Harbour and York's secret plan to liquidate the Debtor starting in December 2008 if sales did not go well in September, October and November, 2008.

67. Neither the Debtor's President, Andrew Todd, nor its Chief Operating Officer, Gary Sugarman, nor Board Members Shore and Prevor, were kept apprised of Bay Harbour's evaluation of possible bankruptcy and/or liquidation in early November, 2008 or its preparation of a bankruptcy filing.

68. The Debtors' bankruptcy estates and the creditors of the Debtors suffered harm as a direct and proximate result of Bay Harbour and York's domination and control of the Debtor and their deception of creditors concerning the Debtor's plans and prospects for operating as a going concern.

69. In the interests of equity and justice, the Court should hold the Bay Harbour and York Defendants, as well as the Bay Harbor Board Members and the York Board Members, liable for the debts and obligations of the Debtors.

## COUNT II: BREACH OF FIDUCIARY DUTY
### (Against Holdco, Teitelbaum, Sozio, Medeiros, Dinan)

70. Plaintiff incorporates and re-alleges paragraphs 1 through 69 of this Complaint as if set forth fully herein.

71. Holdco and its Board of Managers owed the Debtor fiduciary duties of care, loyalty and good faith.

72. The Bay Harbour and York Board Members violated their duty of care to the Debtor in numerous ways, including the following:

    a. Despite learning prior to closing that Steve and Barry's was poorly managed, and despite planning on bringing in new management, the Bay Harbour and York Board Members removed Shore and Prevor from any management position; failed to engage a CFO; and failed to engage a CEO until it was too late to effect any meaningful management change prior to bankruptcy.

    b. The Bay Harbour and York Board Members knew or should have known that there was a substantial risk that Abelco would demand payment of all or part of its loan, but failed to exercise due care in planning for that possibility and/or seeking alternative funding sources.

    c. The Bay Harbour and York Board Members knew or should have known that there was no sound basis for assuming that the existing inventory could be liquidated for the estimated proceeds, but failed to exercise due care in planning for a possible shortfall and/or seeking alternative funding sources.

d. The Bay Harbour and York Board Members knew or should have known that there was no coherent plan for timely acquiring merchandise for the Fall 2008 season that was held at ports on account of the first Bankruptcy Case, given the competing interests and liens on such merchandise resulting from the first Bankruptcy Case, but failed to exercise due care in requiring management to demonstrate a sound plan for timely acquisition of the port merchandise.

e. The Bay Harbour and York Board Members knew or should have known that there was no coherent plan for timely acquiring merchandise for the Fall 2008 season than the merchandise held at ports on account of the first Bankruptcy Case, but failed to exercise due care in requiring management to demonstrate a sound plan, and/or authorizing any such purchases.

f. The Bay Harbour and York Board Members knew or should have known that there was no coherent plan for moving merchandise between liquidating and going-forward stores and/or that there it was too difficult or expensive to do so given existing resources and distribution systems, but failed to exercise due care in requiring management to prepare an effective plan to do so and/or an alternate plan for obtaining necessary merchandise in time for the Fall 2008 season.

g. The Bay Harbour and York Board Members intentionally refused to authorize expenditure of funds on merchandise for the Spring 2009 season and failed to plan or budget funds for such purpose.

h. The Bay Harbour and York Board Members intentionally restricted the authority of Debtor's President and its Chief Operating Officer to manage the

Debtor's business and failed to exercise due care in keeping them advised of important funding issues and related strategic decisions.

73. Additionally, the Bay Harbour and York Board Members breached their duties of loyalty and good faith by directly intervening in the provinces of management, acting as CEO, failing to authorize necessary expenditure of monies, and instead operating the Debtor as an instrumentality of Bay Harbour and York, as set forth above, to the detriment of the Debtor and its creditors, and for the purpose of benefiting Bay Harbour and York.

74. As a direct and proximate result of the breach of fiduciary duty by Holdco and the Bay Harbour and York Board Members, the Debtors, the Debtors' estates, and the creditors of the estates suffered damages, in an amount to be proven at trial.

### COUNT III: BREACH OF FIDUCIARY DUTY
**(Against Todd and Sugarman)**

75. Plaintiff incorporates and re-alleges paragraphs 1 through 74 of this Complaint as if set forth fully herein.

76. As President and Chief Operating Officer of the Debtor, respectively, defendants Todd and Sugarman owed the Debtor fiduciary duties of care, loyalty and good faith.

77. Defendants Todd and Sugarman breached their duty of due care to the Debtor in the following ways, among others:

    a. Todd and Sugarman knew or should have known that there was no sound basis for assuming that the existing inventory could be liquidated for the estimated proceeds, but failed to exercise due care in planning for a possible shortfall and/or seeking alternative funding sources.

b. Todd and Sugarman failed to exercise due care in preparing a coherent plan for timely acquiring merchandise for the Fall 2008 season that was held at ports on account of the first Bankruptcy Case, given the competing interests and liens on such merchandise resulting from the first Bankruptcy Case; failed to competently and timely execute the plan for acquiring new merchandise held at the ports; failed to exercise due care in planning for the possibility that their plan would be delayed or ineffective; and failed to seek seeking alternative sources for new merchandise for going-forward stores.

c. Todd and Sugarman failed to exercise due care in preparing a coherent plan for moving merchandise between liquidating and going-forward stores; failed to competently execute the plan to move the proper mix of fresh merchandise from the distribution center and liquidating stores to going-forward stores and stale merchandise to liquidating stores; and failed to exercise due care in preparing an alternate plan for obtaining necessary merchandise in time for the Fall 2008 season.

78. As a direct and proximate result of the breach of fiduciary duty by Todd and Sugarman, the Debtors, the Debtors' estates, and the creditors of the estates suffered damages, in an amount to be proven at trial.

**COUNT IV: EQUITABLE RECHARACTERIZATION AND/OR SUBORDINATION OF FINCO LOAN**
**(Against Finco, Bay Harbour, York, Hilco, Shore and Prevor)**

79. Plaintiff incorporates and re-alleges paragraphs 1 through 78 of this Complaint as if set forth fully herein.

80. The $75,000,000 Finco Loan to the Debtor was a sham, not a true loan.

81. All of the $75,000,000 purportedly loaned by Finco to the Debtor represented the equity contributions of Bay Harbour, York, Hilco, Prevor and Shore to Holdco, which owned the Debtor.

82. Finco is not in the business of lending money, and there was no legitimate commercial basis for Finco to lend money to the Debtor.

83. Bay Harbour, York, Hilco, Prevor and Shore all understood that the purpose of the Finco Loan was to disguise 75% of their equity contributions as a second lien loan.

84. The Finco Loan had the substance and character of an equity contribution while cast in the form of a loan: There was no commercial negotiation; there were no regular repayments of principal because it was understood the Debtor lacked the ability to make such payments; there were no interest payments because it was understood the Debtor lacked the ability to make such payments; the Debtor was not adequately capitalized to repay the Finco Loan (or otherwise); and the Debtor had no ability to obtain comparable financing from a lending institution at the interest rate provided (or any interest rate).

85. Bay Harbour, York, and the Bay Harbour and York Board Members exercised effective control over both Finco and the Debtor at the time of the Finco Loan and thereafter.

86. In exercising such control, Bay Harbour, York, and the Bay Harbour and York Board Members acted as insiders.

87. Through actual and effective control of the Debtor, Bay Harbour, York, and the Bay Harbour and York Board Members operated the Debtor in an undercapitalized, deceptive and unsound manner, to the detriment of creditors.

88. The exercise of actual and effective control over the Debtor by Bay Harbour, York, and the Bay Harbour and York Board Members was not in the best interest of creditors, and ultimately rendered the Debtor unable to pay its creditors.

89. The exercise of actual and effective control over the Debtor by Bay Harbour, York, and the Bay Harbour and York Board Members constituted overreaching, was inequitable, and was detrimental and unfair to other creditors.

90. The conduct of Bay Harbour, York, and the Bay Harbour and York Board Members was egregious.

91. If the Finco Loan is not recharacterized and/or subordinated, unsecured creditors will receive less than they otherwise would from monies recovered from Defendants in this action and in other actions that may be brought by or on behalf of the Debtors and their estates.

92. Recharacterization and/or subordination of the Finco Loan is consistent with equitable principles and applicable bankruptcy law, and, accordingly, the Court should recharacterize and/or subordinate the Finco claim to the claims of unsecured creditors.

93. The priorities of the Bankruptcy Code require that the Finco Loan be recharacterized and/or subordinated as an equity interest, and that the claims of creditors and the administrative expenses of the Estate be paid before any distribution on account of this equity interest.

WHEREFORE, Plaintiff requests that the Court enter judgment as follows:

(i) for Plaintiff on Count I in the total amount of the Debtors' obligations to creditors;

(ii) for Plaintiff on Count II in the amount of the Debtors' obligations to creditors or in such lesser amount as may be proven at trial;

(iii) for Plaintiff on Count III in the amount of the Debtors' obligations to creditors or in such lesser amount as may be proven at trial;

(iv) for Plaintiff on Count IV, recharacterizing and subordinating the $75 million Finco Loan to the claims of creditors and the administrative expenses of the estate; and

(v) awarding Plaintiff such other relief as the Court finds just and proper.

Dated: April 6, 2009

ARENT FOX LLP

/s/ Robert M. Hirsh
Robert M. Hirsh
Timothy F. Brown (pro hac vice)

1675 Broadway
New York, NY 10019
(212) 484-3900
(212) 484-3990 (Fax)

Counsel for the Official Committee
Of Unsecured Creditors