**UNITED STATES BANKRUPTCY COURT**   **FOR PUBLICATION**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
              :
In re:            :   Chapter 11
              :
BH S&B Holdings LLC, <u>et</u> <u>al.</u>,    :   Case No. 08-14604 (MG)
              :
       Debtors.  :   Jointly Administered
              :
-------------------------------------------------------------x
OFFICIAL COMMITTEE OF UNSECURED :
CREDITORS**,** on behalf of Debtors,   :
              :
       Plaintiff   :
              :
       vs.     :   Adv. Proc. No. 09-01151 (MG)
              :
BAY HARBOUR MASTER LTD., et al.  :
              :
       Defendants :
-------------------------------------------------------------x

**OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS IN
PART WITH PREJUDICE, IN PART WITH LEAVE TO AMEND**

*A P P E A R A N C E S:*

ARENT FOX LLP
*Attorneys for the Official Committee of Unsecured Creditors*
1675 Broadway
New York, NY 10019
By: Robert M. Hirsh, Esq.

ARENT FOX LLP
*Attorneys for the Official Committee of Unsecured Creditors*
1060 Connecticut Avenue, NW
Washington, DC 20036
By: Timothy F. Brown, Esq.

ARNOLD & PORTER LLP
*Attorneys for York Capital Management LP; James G. Dinan; and Luis Medeiros*
399 Park Avenue
New York , NY 10022
By: Richard P. Swanson, Esq.

CADWALADER, WICKERSHAM & TAFT LLP
*Attorneys for Bay Harbour Master Ltd; Trophy Hunter Investments; BH S&B Inc.; Bay Harbour Management LLC; Douglas P. Teitelbaum and Scott Sozio*
One World Financial Cetner
New York, NY 10281
By:     Israel Dahan, Esq.

CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP
*Attorneys for Hilco SB, LLC*
101 Park Avenue
New York, NY 10178
By:     Theresa A. Foudy, Esq.

GRAIS & ELLSWORTH LLP
*Attorneys for BH S&B Finco LLC and BHY S&B Holdco LLC*
70 East 55th Street
New York, NY 10022
By:     Owen L. Cyrulnik, Esq.

HALPERIN BATTAGLIA RAICHT, LLP
*Attorneys for Defendants Gary Sugarman and Andrew Todd*
555 Madison Avenue
9th Floor
New York, NY 10022
By:     Walter Benzija, Esq.
        Neal W. Cohen, Esq.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Attorneys for YSOF S&B Investor LLC; York Special Opportunities Fund LP; York Special Opportunities Feeder Fund (Cayman) LP*
1177 Avenue of the Americas
New York, NY 10036
By:     Arthur H. Aufses III, Esq.


**MARTIN GLENN**
**United States Bankruptcy Judge**

Pending before the Court are all of the defendants' motions to dismiss this adversary

proceeding brought by the Official Committee of Unsecured Creditors (the "Committee") (ECF

Doc. #'s 11, 16, 21, 24, 27, 31).  Repeat corporate bankruptcies, sometimes by the same debtor

and sometimes by a successor entity, particularly under current economic conditions, are,

unfortunately, not uncommon.  This case stands out, however, by the rapidity with which the

debtors here, successors through a chapter 11, section 363 purchase in July 2008 of the Steve &

Barry's women's clothing business for $163 million, subject to various adjustments (Compl. ¶¶

30, 42), descended into their own chapter 11 cases in November 2008.  The debtors' filing here

was followed immediately by a court-approved going-out-of-business sale and the shuttering of

153 stores that the debtors' business plan had hoped to maintain, with the resulting loss of many

jobs.  The debtors are hopelessly insolvent.  At the time of the chapter 11 filings, debtors had $90

million of first lien debt, $75 million of second lien debt, and over $5.4 million in unsecured debt

from their 30 largest unsecured creditors.  (ECF Doc. #s 31 (Affidavit of Richard A. Sebastiao

Pursuant to Local Bankruptcy Rule 1007-2) and 46 (Consolidated List of Creditors Holding the

Thirty Largest Unsecured Claims Against The Debtors).)  At the present time the debtors are, or

are close to, administratively insolvent.

As explained below, Steve & Barry's assets were acquired from the Stone Barn LLC

Chapter 11 estate by a group of private equity investors, and a firm specializing in the liquidation

of retail stores, as well as by several owners of the Stone Barn LLC debtors.  Initially capitalized

by $225 million, including a $125 million first lien loan provided by Abelco Finance LLC

("Abelco"), an affiliate of Cerberus, a $75 million loan provided by a subordinated second lien

facility from Defendant BH S&B Finco, LLC ("Finco"), and $25 million in equity from

defendant BHY S&B Holdco LLC ("Holdco").  (*See* Compl. ¶¶ 31, 35.)  In three months of

operation, in August, September and October, 2008, the acquired business rapidly burned

through its available capital and the new owners declined to invest additional funds.  This

bankruptcy case followed.

The Committee commenced this adversary proceeding against the entities and individuals that were involved in the purchase and short-lived operations of the debtors, seeking to recover money for the estate, based on claims of piercing the corporate veil, breach of fiduciary duty and equitable subordination or recharacterization. The defendants have all moved to dismiss the Complaint. One thing that stands out here is the absence of any allegation that, during the debtors' short-lived and rapid path to bankruptcy, any of the defendants did anything to recover the money they invested or loaned to the debtors. In other words, the defendants too lost a lot of money as this venture failed.

For the reasons explained below, with the exception of the equitable subordination claim against defendant Finco, the Court concludes that the Complaint must be dismissed with prejudice. With respect to the equitable subordination claim against Finco, the Complaint is dismissed with leave to amend within 30 days of entry of this Opinion and Order.

## BACKGROUND

The facts below are taken from the Complaint (ECF Doc. #1) and the original, first, Second and Third Amended and Restated LLC Agreements of BH S&B Holdings, LLC ("Holdings"), and the Amended and Restated LLC Agreement of Holdings's indirect parent, BH S&B Holdco LLC ("Holdco") (collectively, the "LLC Agreements"). [1]

---

[1]    Collectively, the original, first, Second and Third Amended and Restated LLC Agreements of Holdings will be referred to as the "Holdings LLC Agreements." The LLC Agreements are attached as Exhibit I to the Affidavit of Israel Dahan in support of Defendants Bay Harbour Master Ltd., Trophy Hunter Investments Ltd., BH S&B Inc., Bay Harbour Management LLC, Douglas Teitelbaum ("Teitelbaum") and Scott Sozio ("Sozio")'s Motion to Dismiss (ECF Doc. # 26, hereinafter "Dahan Aff."), Exhibit A to the Affidavit of Joseph H. Einstein in support of Defendants Gary Sugarman ("Sugarman") and Andrew Todd ("Todd")'s Motion to Dismiss (ECF Doc. #13, hereinafter "Einstein Aff."), Exhibits S and E to the Dahan Aff., and Exhibit 2 to the Declaration of Richard P. Swanson in support of the motion of Defendants James G. Dinan, Luis Medeiros and York Capital Management, L.P. (together with YSOF S&B Investor, LLC, York Special Opportunities Fund, L.P. and York Special Opportunities Feeder Fund (Cayman), L.P., the "York Defendants") Motion to Dismiss (hereinafter "Swanson Dec."), respectively. None of the defendants have attached to their moving papers any LLC agreement governing

### A.   The First Bankruptcy and Sale of Steve & Barry's

This case arises out of the Bankruptcy Code § 363 sale of the bankrupt Steve & Barry's line of clothing stores and the subsequent bankruptcy filing by the purchaser, Holdings, and its operating subsidiaries (together with Holdings, the "Debtors").  *See In re: Stone Barn Manhattan, LLC*, Case No. 08-12579, ECF Doc. # 628 (Bankr. S.D.N.Y. August 22, 2008) (Gropper, J.).  Steve & Barry's sold licensed university apparel and lifestyle brands, private label casual clothing and accessories for men, women and children, and exclusive celebrity branded lines of apparel and accessories.  (Compl. ¶ 25.)  At the time it filed for bankruptcy on July 9, 2008, Steve & Barry's, through its parent corporation, S&B Industries, Inc., operated 276 stores. (*Id.*)  Steve & Barry's filed for bankruptcy due to a liquidity crisis caused by a host of reasons, including: delayed store openings, delayed receipts of tenant allowances, and reduced borrowing capacity arising from inventory appraisal reductions, all exacerbated by the instability in the credit markets.  (*Id.* ¶ 27.)

On August 21, 2008, Holdings purchased a majority of the assets and liabilities of S&B Industries, Inc. in a § 363 sale in the Steve & Barry's bankruptcy proceeding.  (*Id.* ¶ 24.)  The purchase price for the acquisition was $163 million, subject to various adjustments.  (*Id.* ¶ 30.) The Bankruptcy Court for the Southern District of New York approved the sale in an order on August 22, 2008.  (*Id.* ¶ 24.)

### B.   The Formation of Holdings and Its Corporate Structure

Defendant Teitelbaum formed Holdings on behalf of defendants Bay Harbour Management LC, Bay Harbour Master Ltd., Trophy Hunter Investments, Ltd., and BH S&B, Inc. (collectively, "Bay Harbour") for the purposes of entering into the Asset Purchase Agreement

---

Holdings's alleged direct parent, BHY Intermediate Holdco LLC ("Intermediate Holdco").  Accordingly, the Court has not considered any LLC agreement of Intermediate Holdco.

with S&B Industries on July 28, 2008.  (Compl. ¶ 28; Dahan. Aff., Ex. I, ¶ 2.)  According to the

Complaint, Holdco was formed by Bay Harbour to serve as a holding company for Holdings and

was Holdings's sole managing member; Holdco was eventually replaced by Intermediate

Holdco, against whom plaintiff has not brought any causes of action.  (Compl. ¶ 29.)

Intermediate Holdco was later interposed as an intermediate entity between Holdco and

Holdings, with the same managerial powers as Holdco.  (*Id.* ¶ 49; Dahan Aff. Exs. I, S and E;

Einstein Aff., Ex. A.)  However, according to the original and Amended and Restated, and

Second and Third Amended and Restated LLC Agreements of Holdings, the sole initial member

of Holdings was Bay Harbour Holdings LLC ("Bay Harbour LLC"), which remained the sole

member until August 22, 2008.  (original LLC Agreement of Holdings, Dahan Aff., Ex. I;

Amended and Restated LLC Agreement of Holdings, Einstein Aff., Ex. A.)  There are

contradicting statements in the Second and Third Amended and Restated LLC Agreement of

Holdings as to when Intermediate Holdco became the sole managing member of Holdings.

According to the Second Amended and Restated LLC Agreement of Holdings, on August 22,

2008, Bay Harbour LLC "contributed, conveyed, assigned, transferred, and delivered to 'Holdco'

[defined therein as 'BHY S&B Holdco LLC'] 100% of [its] membership interests of

[Holdings]," pursuant to a "certain Contribution Agreement."  (Second Amended and Restated

LLC Agreement of Holdings, Dahan Aff., Ex. S.)  However, the Third Amended and Restated

LLC Agreement of Holdings indicates that on August 22, 2008, Bay Harbour LLC "contributed,

conveyed, assigned, transferred, and delivered to 'Holdco' [defined therein as 'S&B Intermediate

Holdco LLC'] 100% of [its] membership interests" in Holdings, making 'Holdco' the sole

managing member of Holdings, pursuant to a "certain Contribution Agreement" but also, that

"on October 9, 2008, 'Holdco' as the sole managing member of [Holdings], contributed,

conveyed, assigned, transferred, and delivered to "Intermediate Holdco" [also defined as 'S&B Intermediate Holdco LLC'] 100% of its membership interests in Holdings as the sole member of the Company, pursuant to a "certain Contribution Agreement." (Dahan Aff., Ex. E.) In the Complaint, plaintiff alleges that Intermediate Holdco was interposed as an "intermediate holding Debtor of the Debtor" on or about October 14, 2008. (Compl. ¶ 49.) Furthermore, the Second Amended and Restated Limited Liability Company Agreement of Holdings also indicates that the sole Member of the Company is Holdco; whereas the Third Amended and Restated Limited Liability Agreement of Holdings indicated that the sole Member of the company is Intermediate Holdco. (Dahan Aff., Exs. S and E, at 2.) Accordingly, there appears to be a factual issue as to identity of Holdings's management from August 22, 2008 to October 14, 2008.

Section 3.12(g) of Holdco's LLC Agreement states that "[n]o Manager shall be liable to the Company or any Member or Economic Owner for monetary damages for breach of fiduciary duty as a Manager; provided that the foregoing shall not eliminate or limit the liability of a Manager: (i) for any breach of such Manager's duty of loyalty to the Company or its Unitholders (as such duty is modified pursuant to the terms of this Agreement); (ii) any acts or omissions that constitute fraud, willful misconduct, bad faith or gross negligence in the conduct of such Manager in his capacity as a Manager of the Company, or (iii) for any transaction from which such Manager derived an improper personal benefit." (Einstein Aff., Ex. B.) Similarly, Section 7 of the Holdings LLC Agreements provides, in each agreement with the exception of the original LLC Agreement of Holdings:

> [t]he Company shall indemnify and hold harmless the Member, the agents of the Company and their respective heirs, successors, executors, administrators, legal representatives and assigns, from and against (and none of them shall be liable for) any loss, cost, expense (including attorneys' fees), judgment or liability incurred by or imposed upon such person in connection with any action, suit

> or proceeding (including any proceeding before any administrative
> or legislative body or agency) to which such person may be a party
> or otherwise be involved or with which such person shall be
> threatened by reason of being or having been the Member, or
> having served the Company as an agent of the Member, or
> participating in the conduct of the business of the Company at the
> direction of the Member, provided that such person shall not be so
> indemnified to the extent such cost, expense, judgment or liability
> shall have been finally determined in a decision on the merits in
> any such action, suit or proceeding to have been incurred or
> suffered by such person by reason of his or her gross negligence,
> willful breach of this Agreement or willful violation of law.

(Einstein Aff. Ex. A; Dahan Aff. Exs. S and E.)

Defendants Andrew Todd and Gary Sugarman were President and Chief Operating

Officer of Holdings.  (Compl. ¶ 76.)  Hal Kahn was hired as the Chief Executive Officer (CEO)

of Holdings in the latter half of October, 2008.  (*Id*. ¶ 58.)  The consulting firm of JH Cohn,

retained by Teitelbaum, performed Chief Financial Officer (CFO) services for Holdings.  (*Id*. ¶

60.)

Holdings was capitalized by a $125 million short-term loan from Abelco, payable on

demand ("Abelco Loan"),[2] and $100 million in capital contributions.  (*Id.* ¶ 31.)  The $100

million capital contributions came from the following sources:  $35 million from Bay Harbour;

$35 million from various entities affiliated with York Capital Management, all of whom are

defendants ("York"); $10 million each from the Steve & Barry's co-founders, defendants Steven

Shore and Barry Prevor (for a total of $20 million); and $10 million from defendant Hilco SB

LLC ("Hilco"), a company that had initially sought to acquire Steve & Barry's inventory for

---

[2]    Bay Harbour's plan was to quickly repay the Abelco Loan and refinance it.  (*Id.* ¶ 43.)  Otherwise, Bay Harbour
and Abelco agreed that the loan would be converted to a revolving loan that would be reduced to $105 million 90
days after closing; to $85 million 121 days after closing; and $65 million from the 150th day to maturity.  (*Id.* ¶ 44.)
In addition, the parties agreed that the revolving loan was subject to a further reduction equal to the lesser of 70% of
the domestic eligible inventory or 80% of the appraised net orderly liquidation value of inventory.  (*Id.* ¶ 45.)

liquidation purposes, but was persuaded to join in the bid in exchange for the right to handle liquidation of the stores Bay Harbour did not intend to keep.  (*Id.* ¶¶ 32-33.)

At Bay Harbour's direction, Holdco contributed $25 million of the $100 million directly to Holdings, and contributed $75 million to its affiliate, defendant Finco, that in turn entered into a second lien facility with Holdings in the same amount, junior only to the Abelco Loan.  (*Id.* ¶ 35.)  Holdco had a seven-member of board of managers, consisting of two representatives from Bay Harbour (defendants Teitelbaum and Scott Sozio ("Sozio")[3]); two representatives of York (defendants Luis Medeiros ("Medeiros") and James Dinan ("Dinan")[4]); one representative of Hilco, and defendants Shore and Prevor.  (*Id.* ¶ 36.)  Holdings had a single managing member—first Holdco, and then Intermediate Holdco.  (*Id.* ¶29; Second Amended and Restated Limited Liability Company Agreement, Dahan Aff., Ex. S; Third Amended and Restated Limited Liability Company Agreement, Dahan Aff., Ex. E, at 2.)  The corporate structure, capitalization, and the relationship among the defendants and Holdings can be depicted as follows:



---

[3]   Together, the "Bay Harbour Employee Defendants."

[4]   Together, the "York Employee Defendants."



### C.    Holdings' Business Operations

At the time it was formed, Holdings had the following business plan:

- Operate 153 stores on a going-forward basis, and liquidate the remaining stores

- Renegotiate the leases for the going-forward stores

- Replace senior management

- Procure new and fresh merchandise for the going-forward stores

- Benefit from the migration of customers to lower-priced apparel due to the economic downturn

- Improve profitability through more tiers of pricing

- Increase the percentage of merchandise representing celebrity licensed apparel

- Improve the frequency of inventory turnover

- Reduce fixed and operating costs

- Move to a "piece pick" method of shipping inventory from Steve & Barry's distribution center

- Improve the computer systems

(Compl. ¶ 37.)  The most critical element of the business plan was to obtain new and fresh merchandise for the going-forward stores.  (*Id.* ¶ 38.)  Holdings estimated that it would need in excess of $100 million in merchandise for this purpose.  (*Id.*)  The plan was to acquire the necessary merchandise from the following sources:

- $32 million held at port on account of the Steve & Barry's bankruptcy case

- $25 million from domestic sources

- $20 million ready to be shipped from overseas

- $15 million in materials purchased by vendors but not yet manufactured

- $15 million in inventory from liquidating stores

(*Id.* ¶ 39.)  In addition, Holdings was to consolidate fresh inventory into going-forward stores and stale inventory to liquidating stores.  (*Id.* ¶¶ 40-41.)  However, of the $225 million total capitalization of Holdings, only $40 million was set aside for inventory purchases.  (*Id.* ¶ 42.)

### D.    Holdings' Performance Between Closing and Bankruptcy

After the purchase of Holdings and the implementation of the business plan, things almost immediately went sour for the Steve & Barry's brand.  In September and October 2008, sales were less than anticipated.  Specifically, the Committee alleges that the following failures on the part of management contributed to the deterioration of Holdings:

- Failure to obtain new merchandise necessary to drive sales

- Failure to accomplish timely and effective transfer of merchandise from liquidating stores to going-forward stores

- Failure to timely and appropriately transfer merchandise from Holdings's

   distribution center to individual stores, resulting in insufficient merchandise and

   poor selection

(*Id.* ¶ 46.)  As a result, sales at liquidating stores were less than anticipated.  (*Id.* ¶ 47.)

Things moved rapidly downhill from there.  On October 14, 2008, the Abelco Loan was converted to a revolving loan.  (*Id.* ¶ 49.)  The same day, Abelco reduced the value of its loan, resulting in a sweep of $28.5 million from Holdings's cash accounts.  (*Id.* ¶ 50.)  At the same time, York and Bay Harbour prohibited Holdings from ordering new merchandise for the Spring 2009 season.  (*Id.* ¶ 51.)  By early November 2008, Bay Harbour and York concluded that Holdings needed additional capital to survive, but refused to provide it.  (*Id.* ¶¶ 52-53.)  At about that same time, Bay Harbour and York prepared for Holdings's bankruptcy filing, which occurred on November 19, 2008.

### E.    Bay Harbour's and York's Management of Holdings

From the beginning, the Committee alleges that Bay Harbour and York effectively treated Holdings as an extension of themselves.  (*Id.* ¶ 56.)  It notes that no board meetings were ever held, that Holdings was run by a "consensus" of the Bay Harbour and York members, with no input from the other managers of Holdco, Holdings's indirect parent.  The Committee makes no allegations with respect to the managers of Intermediate Holdco, whether Holdco was in turn being managed by Intermediate Holdco which became the sole managing member of Holdings at some point between August and October 2008, nor does it name Intermediate Holdco as a defendant; it merely alleges that Intermediate Holdco was "interposed as an intermediate holding Debtor of the Debtor."  (*Id.* ¶ 49.)

Further, the Committee alleges that Holdings had no CEO (except for Bay Harbour, which acted as a *de facto* CEO) until Hal Kahn was hired in late October 2008, and that even then Kahn had no real authority.  (*See Id.* ¶¶ 57-59.)  In addition, the Committee alleges that Bay Harbour, with the consent of York, exercised strict control over the expenditure of funds by Holdings's management, through JH Cohn.  (*Id.* ¶ 60.)  With Bay Harbour effectively running the show, the Committee alleges that Holdings was not adequately capitalized for its own financial needs and for risks to its business plan.  (*Id.* ¶ 62.)

There was a reason for this management style, according to the Committee.  Specifically, the Committee alleges that Bay Harbour and York had a secret back-up plan to liquidate Holdings in December 2008 if sales did not go well in September, October, and November 2008. (*Id.* ¶ 63.)  They never informed Holdings's management, Shore, or Prevor of the plan.  (*Id.* ¶¶ 66-67.)  In furtherance of that plan, Bay Harbour and York failed to authorize any substantial expenditures to acquire merchandise for the Spring 2009 season.  (*Id.* ¶ 64.)  In addition, Bay Harbour and York caused Holdings to continue to incur obligations to creditors without disclosing to creditors that no funds were being expended to continue as a going concern past year-end.  (*Id.* ¶ 65.)

**F.    Causes of Action**

The Committee alleges that the above facts support four causes of action against the defendants:

*First*, the Committee alleges that Bay Harbour's and York's domination and control of Holdings via Holdco harmed Holdings and the estate and gives rise to a claim of piercing the corporate veil.  The Committee therefore argues that Bay Harbour, York, and the individual employee defendants of Bay Harbour and York (Teitelbaum, Sozio, Meideiros and Dinan,

collectively, the "Bay Harbour and York Employee Defendants") should be liable for the debts and obligations of the debtors.

*Second*, the Committee alleges that Holdco, the indirect parent of Holdings (the sole managing member of which, as of August or October 2008, as noted *supra*, was Intermediate Holdco, the direct child of Holdco), as well as the Bay Harbour and York Employee Defendants, breached their duties of care, loyalty, and good faith to Holdings. Specifically, the Committee alleges that the Bay Harbour and York Employee Defendants (apparently as members of the Board of Managers of Holdco, which allegedly owed fiduciary duties to Holdings, as the direct parent of Intermediate Holdco and the indirect parent of Holdings, though it is not at all clear from the Complaint) breached their duties of care to Holdings by: (1) removing Shore and Prevor from management and failing to engage a CEO and CFO until it was too late to help the company, even though they knew that Steve & Barry's was poorly managed; (2) failing to plan on Abelco demanding full payment of its loan; (3) failing to plan for an inventory shortfall, even though they had no basis to assume that existing inventory could be liquidated for the estimated proceeds; (4) failing to implement a coherent plan for acquiring merchandise that was held at ports for the 2008 season; (5) failing to plan properly for moving merchandise between liquidating and going-forward stores; (6) refusing to authorize further expenditures on merchandise for the Spring 2009 season; and (7) intentionally restricting the authority of Holdings's President and Chief Operating Officer to manage the company. (*Id.* ¶¶ 71-72.) In addition, the Committee alleges that the Bay Harbour and York Employee Defendants breached their duties of loyalty and good faith by operating Holdings as an extension of themselves for their own benefit and to the detriment of Holdings. (*Id.* ¶ 73.)

*Third*, the Committee alleges that Andrew Todd and Gary Sugarman, Holdings's President and Chief Operating Officer, respectively, breached their fiduciary duty of care to Holdings in three ways: (1) failing to plan for a possible shortfall in inventory; (2) failing to plan for acquiring merchandise held at ports and failing to plan coherently for any possible delay; and (3) failing to plan for moving inventory between going-forward and liquidating stores.  (*Id.* ¶ 77.)

*Fourth*, the Committee brings an action against Finco, Bay Harbour, York, Hilco, Shore, and Prevor to equitably subordinate, or, in the alternative, to recharacterize the $75 million Finco loan as an equity contribution.  The Committee alleges that the loan was a "sham," because it actually represented the equity contributions of Bay Harbour, York, Hilco, Prevor, and Shore to Holdco.  (*Id.* ¶¶ 80-81.)  The Committee notes that Finco was not in the business of lending money, there was no commercial basis for Finco to lend money to Holdings, there was no negotiation over the terms of the loan, and there were no regular repayments of principal because everyone knew Holdings lacked the ability to repay the loan.  (*Id.* ¶¶ 82-84.)  In addition, the Committee alleges that because Bay Harbour and York effectively controlled Finco, they were insiders to the loan.

### G.    Procedural Background

The Committee filed the Complaint on April 6, 2009.  All of the defendants moved to dismiss the Complaint with prejudice.  The Court heard oral argument on September 8, 2009 and took the matter under submission.  For the reasons explained below, the Complaint is dismissed with prejudice with respect to all causes of action, except for the equitable subordination claim against Finco, which is dismissed with leave to amend within 30 days of entry of this Opinion and Order.

# DISCUSSION

## A.     Standard on a Motion to Dismiss

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  To survive a Rule 12(b)(6) motion to dismiss "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, --- U.S. ----, 129 S.Ct. 1937, 1949 (2009)(internal quotation marks omitted).  Courts deciding motions to dismiss must draw all reasonable inferences in favor of the nonmoving party and must limit their review to facts and allegations contained in (1) the complaint, (2) documents either incorporated into the complaint by reference or attached as exhibits, and (3) matters of which the court may take judicial notice. *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  The court also considers documents not attached to the complaint or incorporated by reference, but "upon which the complaint *solely* relies and which *[are] integral to the complaint*."  *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (emphasis in original); *Kalin v. Xanboo, Inc.*, 2009 WL 928280, at *8 (S.D.N.Y. Mar. 30, 2009) (Sullivan, J.); *Grubin v. Rattet ( In re Food Mgmt. Grp.)*, 380 B.R. 677,  690 (Bankr. S.D.N.Y. 2008) ("*Food Mgmt.*") (holding that a court may consider documents that have "not been incorporated by reference 'where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.'").

Following the Supreme Court's recent decision in *Ashcroft v. Iqbal*, courts use a two-prong approach when considering a motion to dismiss.  *See, e.g.*, *Weston v. Optima Commc'ns Sys., Inc.*, No. 09 Civ. 3732(DC), 2009 WL 3200653, at *2 (S.D.N.Y. Oct. 7, 2009) (Chin, J.) (acknowledging a "two-pronged" approach to deciding motions to dismiss); *S. Ill. Laborers' and*

*Employers Health and Welfare Fund v. Pfizer, Inc.*, No. 08 CV 5175(KMW), 2009 WL 3151807, at *3 (S.D.N.Y. Sept. 30, 2009) (Wood, J.) (same); *Inst. for Dev. of Earth Awareness v. People for the Ethical Treatment of Animals*, No. 08 Civ. 6195(PKC), 2009 WL 2850230, at *3 (S.D.N.Y. Aug. 28, 2009) (Castel, J.) (same).  First, the court must accept all factual allegations in the complaint as true, discounting legal conclusions clothed in factual garb.  *Iqbal*, 129 S.Ct. at 1949-50; *Boykin v. Keycorp*, 521 F.3d 202, 204 (2d Cir. 2008); *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008).  Second, the court must determine if these well-pleaded factual allegations "plausibly suggest an entitlement to relief." *Iqbal*, 129 S.Ct. at 1951.

Courts do not make plausibility determinations in a vacuum; it is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 1950.  A claim is plausible when the factual allegations permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 1949.   Meeting the plausibility standard requires a complaint to plead facts that show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 557).  A complaint that only pleads facts that are "merely consistent with a defendant's liability" does not meet the plausibility requirement.  *Id.*

In deciding a motion to dismiss, a court may consider documents that are integral to the complaint.  *Roth*, 489 F.3d at 509; *Kalin*, 2009 WL 928280, at *8; *Food Mgmt.*, 380 B.R. at 690.

Here, the LLC Agreements are integral to the Complaint; furthermore, the plaintiff acknowledges that the Court may consider the LLC Agreements in deciding the motions to dismiss.  (*See* Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss, ECF Doc. #41, hereinafter "Plaintiff's Opposition", at 2.)

When documents contain statements that contradict allegations in a complaint, the documents control and the court need not accept as true the allegations in the complaint. *Roth*, 489 F.3d at 510-11. The "documents may properly be considered only to the extent the court considers the documents for 'what' they contain, 'not to prove the truth' of their contents." *Id.* at 511. Where an allegation in the complaint conflicts with other allegations, or where plaintiff's own pleadings are contradicted by other matter asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint, the court is neither obligated to reconcile the pleadings with the other matter nor accept the allegation in the pleadings as true in deciding a motion to dismiss. *DeBlasio v. Merrill Lynch & Co., Inc.*, No. 07 Civ. 318(RJS), 2009 WL 2242605, at *26 (S.D.N.Y. 2009) (citing *Koulkina v. City of New York,* No. 06 Civ. 11357(SHS), 2009 WL 210727, at *6 (S.D.N.Y. Jan. 29, 2009)); *Fisk v. Letterman,* 401 F. Supp. 2d 362, 368 (S.D.N.Y.2005)) ("The Court, however, is not obliged to reconcile plaintiff's own pleadings that are contradicted by other matters asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint."). Accordingly, the Court decides these motions to dismiss without determining when, between August 22, 2008 and October 14, 2008, Holdco was replaced by Intermediate Holdco as the sole Manager of Holdings.

### B.    Choice of Law

Since Holdings, Holdco and most of the other corporate entities here are based in Delaware, Delaware law applies to the veil-piercing and fiduciary-breach claims. *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) ("The law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders.") (citing *Kalb, Voorhis & Co. v. American Fin. Corp*., 8 F.3d 130, 132 (2d Cir.

1993)).  The parties also agreed in their briefs that Delaware law controlled.[5]  The Court will

therefore apply Delaware law to the veil piercing and breach of fiduciary duty claims.  *American*

*Fuel Corp. v. Utah Energy Development Co., Inc.,* 122 F.3d 130, 134 (2d Cir. 1997) ("where the

parties have agreed to the application of the forum law, their consent concludes the choice of

law inquiry")

### C.    Piercing the Corporate Veil

*1.    Standard*

In general, the corporate form is sacrosanct and courts will not disturb it to hold

shareholders of a corporation, or members of an LLC, liable.  "There is, of course, no doubt that

upon a proper showing corporate entities as between parent and subsidiary may be disregarded

and the ultimate party in interest, the parent, be regarded in law and fact as the sole party in a

particular transaction."  *Pauley Petroleum Inc. v. Continental Oil Co.*, 239 A.2d 629, 633 (Del.

1968).  "Persuading a Delaware court to disregard the corporate entity is a difficult task."

*LaSalle Nat'l Bank v. Perelman*, 82 F. Supp. 2d 279, 295 (D. Del. 2000) (citing *Harco v. Nat'l*

*Ins. Co. v. Green Farms, Inc.*, 1989 WL 110537, at *9-10 (Del. Ch. Sept. 19, 1989)).  Piercing

the corporate veil "may be done only in the interest of justice, when such matters as fraud,

contravention of law or contract, public wrong, or where equitable consideration among

members of the corporation require it . . . ."  *Pauley Petroleum*, 239 A.2d at 633.

---

[5]    Bay Harbour noted in its motion to dismiss that two of the corporate entities which veils Bay Harbour alleges
the Committee is seeking to pierce are organized in Florida and the Cayman Islands.  (Mem. of Law in Supp. of
Defs.' Bay Harbour Master Ltd.'s, Trophy Hunter Investment Ltd.'s, BH S&B Inc.'s, Bay Harbour Management
LC's, Douglas Teitelbaum's and Scott Sozio's Mot. to Dismiss the Compl. (hereinafter, "Bay Harbour
Memorandum"), at 13.)  Even assuming that the Committee has to pierce those corporate veils as well, Bay Harbour
concedes that Florida and Cayman law do not differ materially from Delaware law in any relevant respect.  The
Court therefore relies on Delaware law in rendering this Opinion.  *Id.*

Under Delaware law, to pierce the corporate veil and establish alter-ego liability, a plaintiff must show (1) that the parent and subsidiary "operated as a single economic entity," and (2) that an "overall element of injustice or unfairness is present." *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 528 (D. Del. 2008); *Brown v. Gen. Elec. Corp. (In re Foxmeyer Corp.)*, 290 B.R. 229, 235 (Bankr. D. Del. 2003) (citing *Fletcher*, 68 F.3d at 1457).

With respect to the first factor, determining whether the parent and subsidiary acted as a single economic entity, courts look to numerous factors, identified by the Third Circuit in *United States v. Pisani*, 646 F.2d 83, 88 (3d Cir. 1981):  (1) undercapitalization, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) insolvency of the debtor corporation at the time, (5) siphoning off of the corporation's funds by the dominant parent, (6) absence of corporate records, and (7) the fact that the corporation is merely a façade for the operations of the dominant parent. *Trevino*, 583 F. Supp. 2d at 528-29 (citing *Pisani*, 646 F.2d at 88).  Examples of  "corporate formalities" include "whether dividends were paid, corporate records kept, [and] officers and directors functioned properly." *United States v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1104 (D. Del. 1988) (citing *Dewitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 686-87 (4th Cir. 1976)).  "While no single factor justifies a decision to disregard the corporate entity, some combination of the above is required, and an overall element of injustice or unfairness must always be present, as well." *Trevino*, 583 F. Supp. 2d at 529 (citing *Golden Acres, Inc.*, 702 F. Supp. at 1104).  The Committee alleges that factors (1), (2) and (7) support piercing the corporate veil here.  (*See* Compl. ¶¶ 55-69.)

With respect to the second factor required to pierce the corporate veil—a showing of unfairness or injustice—while a showing of fraud is not necessary, "the requisite injustice or unfairness . . . is also not simple in nature but rather something that is similar in nature to fraud

20

or a sham." *Foxmeyer*, 290 B.R. at 236 (citing *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.

Supp. 260, 268 (D. Del. 1989)).  The "fraud or similar injustice . . . must, in particular, 'be found

in the defendants' use of the corporate form.'"  *Id.* (quoting *Mobil Oil Corp.*, 718 F. Supp. at

269).  In other words, "the underlying cause of action, at least by itself, does not supply the

necessary fraud or injustice.  To hold otherwise would render the fraud or injustice element

meaningless, and would sanction bootstrapping."  *Id.* (internal quotation marks omitted).  "A

court shall only pierce the corporate veil in order to prevent fraud, illegality, or injustice, or the

adverse effects thereof."  *Id.*

Furthermore, at the motion to dismiss stage, it is insufficient to make conclusory

"[a]llegations of mere domination or control by one entity over another . . . .  Rather, the extent

of the domination and control must preclude the controlled entity from having legal or

independent significance of its own.  There must be an abuse of the corporate form to effect a

fraud or an injustice—some sort of elaborate shell game."  *Off. Comm. of Unsecured Creditors v.*

*Beckoff (In re RSL COM PRIMECALL, Inc.)*, 2003 WL 22989669, at *15 (Bankr. S.D.N.Y.

2003) (Gropper, J.) ("*RSL*") (citing *Off. Comm. of Unsecured Creditors v. Morgan Stanley & Co.*

*(In re Sunbeam Corp.)*, 284 B.R. 355, 366 (Bankr. S.D.N.Y. 2002) (Gonzalez, J.) ("*Sunbeam*")

(internal quotation marks omitted)).

2.      *How Many Veils Must Be Pierced?*

As a threshold matter, the Court must consider *how many* veils the Committee has to

pierce to reach Holdings's parents and their officers and directors at Bay Harbour and York.

Specifically, as described above, there are numerous corporate entities standing between

Holdings, the principal operating company, and the various Bay Harbour and York entities and

employees that are named as defendants.  Bay Harbour and York argue that not only must the

Committee pierce Holdings's corporate veil, but the Committee must also pierce the veil of each

individual corporate entity standing above Holdings—Intermediate Holdco, Holdco, York , Bay

Harbour, and each individual Bay Harbour and York Employee Defendant against whom the

Committee alleges a veil piercing claim.  The law in this respect is far from clear.  One case the

defendants rely upon, *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 2d

633, 689 (S.D.N.Y. 2006), involves Dutch law, not Delaware law.  They cite another case,

however, where the court applied Delaware law and held that each separate corporate entity had

to have its veil pierced to sustain a cause of action against corporate parents.  *See Faulkner v.*

*Kornman (In re Heritage Org., LLC)*, 2009 WL 1349209, at *53 (Bankr. N.D. Tex. May 11,

2009) (holding that the "two-pronged [veil-piercing] test must be applied to, and satisfied at,

each level or layer of ownership applicable within the multi-faceted entity structure").[6]

On the other hand, courts in other contexts, such as collapsing fraudulent conveyance

claims, indicate that a bankruptcy court should not elevate form over substance, and have refused

to permit the corporate structure to stand in the way of a finding of liability, particularly if the

defendant had knowledge of the fraud.  *See, e.g.*, *Sunbeam*, 284 B.R. at 370 ("Courts have

'collapsed' a series of transactions into one transaction when it appears that despite the formal

structure erected and the labels attached, the segments, in reality, comprise a single integrated

scheme when evaluated focusing on the knowledge and intent of the parties involved in the

transaction.").  Permitting corporate actors to erect a series of shell corporations to make it more

difficult for prospective plaintiffs to sue the real owners also makes little sense from a policy

---

[6]    The other cases cited by the defendants either did not address the question directly, *see In re Greater Southeast Cmty. Hosp. Corp. I*, 353 B.R. 324, 353 (Bankr. D.D.C. 2006) (fiduciary breach claims, but only a passing mention of the necessity of piercing the corporate veil for each corporate entity), or did not apply Delaware law, *see Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 380-81 (7th Cir. 2008) (Illinois law), *Bouriez v. Carnegie Mellon Univ.*, 2005 WL 3006831, at *16 (W.D. Pa. Nov. 9, 2005) (Pennsylvania law).

standpoint.  The Committee, however, provides no authority as to why it should only have to

pierce Holdings's veil to reach Bay Harbour, York and the Bay Harbour and York Employee

Defendants, simply arguing that Delaware law only provides that a veil can be pierced to "hold

the true owners responsible."  The court in *In re Heritage Org., LLC* rejected this argument,

however, noting that such a veil-piercing theory "does not work on such a global basis," and

required the plaintiff to submit evidence to pierce the corporate veil at each level.  *In re Heritage

Org., LLC*, 2009 WL 1349209, at *53.

Since, as discussed below, the Committee has not adequately pled a veil-piercing theory

with respect to Holdings—and cannot plead it under any circumstances, dictating a dismissal

with prejudice—the Court does not have to reach the question whether the Committee would

have to pierce each veil separately.  Under these circumstances, for the reasons explained below,

the veil-piercing claim is dismissed with prejudice.

> 3.    *Application of the Standard to the Committee's Complaint*

The Committee argues that the following allegations in the Complaint support a finding

that Bay Harbour and York, through Holdco, totally dominated Holdings and treated Holdings as

a mere instrumentality:  (a) Holdings was inadequately capitalized; (b) corporate formalities

were not observed in that Holdings had no management or board of directors; and (c) Holdings

functioned as a façade for Bay Harbour and York.  (Compl. ¶¶ 55-69.)  Evaluating each of these

allegations separately shows that they are insufficient to pierce the corporate veil.

> a.    Inadequate Capitalization

The Committee argues that Holdings was inadequately capitalized from its inception,

since Holdings's business plan required the purchase of $100 million of merchandise, but

Holdings only had $40 million in unencumbered cash on-hand.  The Committee argues that this

supports an inference that Holdings was established for a sham purpose and its corporate veil should be pierced.

As an initial matter, undercapitalization is rarely sufficient to pierce the corporate veil, because otherwise "the veil of every insolvent subsidiary or failed start-up corporation could be pierced." *RSL*, 2003 WL 22989669, at *16. The inquiry "is most relevant for the inference it provides into whether the corporation was established to defraud its creditors or other improper purpose such as avoiding the risks known to be attendant to a type of business." *Trevino*, 583 F. Supp. 2d at 530 (finding no alter-ego liability where plaintiff conceded subsidiary established for legitimate business purpose). When determining whether a subsidiary was adequately capitalized, courts focus on the initial capitalization: "whether a corporate entity was or was not set up for financial failure." *George Hyman Constr. Co. v. Gateman*, 16 F. Supp. 2d 129, 152-53 (D. Mass. 1998).

The Committee concedes in the Complaint that Holdings was established for a legitimate business purpose. (*See* Compl. ¶ 28 (Holdings was established "for the purpose of entering into the APA, liquidating a portion of Steve and Barry's retail stores, and continuing to operate the remaining stores and related business as a going concern").) Therefore, the defendants argue, even if the allegations regarding undercapitalization were true, it could not support the inference that Holdings was formed for an illegitimate business purpose, because such an inference would be contradicted by the Complaint itself. Further, the defendants argue that the allegations in the Complaint could not support a finding of undercapitalization in any event, because Holdings was initially capitalized with $225 million, with $55 million cash on-hand to operate its business ($40 million for inventory, plus a $15 million cash-cushion).

The Committee responds by arguing that the undercapitalization test focuses on unencumbered assets, not just cash available on hand. *See* 1 William Meade Fletcher, Fletcher Cyc. of the Law of Private Corp. § 41.33 (2009); *Cent. Ill. Carpenters Health & Welfare Trust Fund v. Struben*, 2009 WL 497393, at *16 (C.D. Ill. 2009) ("Undercapitalized means that the company has failed to set aside unencumbered capital reasonably adequate for the corporation's prospective liabilities.") (internal quotations marks omitted). The Committee argues that because the Abelco Loan, which represented $125 million of the $225 million initial capitalization, was subject to reductions based on inventory levels, there was no adequate capitalization for running the business beyond a couple of months. The defendants respond by arguing that with $55 million in cash on hand, Holdings had enough cash to purchase inventory.

The Court need not reach the question whether Holdings was adequately capitalized, because it finds that the allegations in the Complaint do not support a finding that Holdings was established as a sham entity. As noted above, the Complaint concedes that Holdings was initially a legitimate business. Therefore, even if it were true that Holdings was inadequately capitalized at the time, it could not support the inference that Holdings served an illegitimate purpose. In addition, the undercapitalization would be insufficient to pierce the corporate veil for the same reason articulated by Judge Gropper in *RSL*: it is a rare instance that the veil should be pierced because of undercapitalization, because otherwise every insolvent subsidiary would have its veil pierced. *RSL*, 2003 WL 22989669, at *16. Here, even if the allegations were true, the circumstances would not be unusual enough to support veil-piercing. Holdings had cash on hand, and, by the Complaint's own admission, sufficient funds to operate for at least a few months. Without any more unusual facts or circumstances, the facts as alleged, even if true,

would not support disregarding the corporate form.  The facts, as alleged in the Complaint, cannot support a finding that Holdings was undercapitalized.

                b.      Failure to Observe Corporate Formalities

The Committee alleges that Holdings failed to observe certain corporate formalities, further supporting piercing the corporate veil, including that Holdings had no Board meetings. (Compl. ¶ 57.)  Though the Committee failed to mention it, Holdings had a single Manager at all times—Bay Harbour, Holdco and then Intermediate Holdco; however, the Holdings LLC Agreements, which, as noted *supra*, the Court is considering for purposes of the motions to dismiss, make this clear.  (*See* Dahan Aff., Exs. I, S and E; Einstein Aff., Ex. A.)  Furthermore, though the Committee failed to point it out, the Holdings LLC Agreements provide that each respective Manager had "all of the powers and authority of a managing member under the [Delaware Limited Liability Company] Act, including, without limitation all necessary authority to conduct the business of the [c]ompany, to open bank or brokerage accounts, to place orders for the purchase or sale of securities, to exercise all rights with respect thereto and to enter into and execute and deliver agreements and other instruments on behalf of the [c]ompany." *Id.*

The Committee, did, however, allege that Holdings had no CEO until a few weeks before the bankruptcy filing; its CFO was a consulting firm reporting directly to the Bay Harbour and York members of Holdco's Board; all major (and many minor) strategic and financial decisions were made by Bay Harbour and York directly; and Holdings's management was generally kept in the dark.  (Compl. ¶¶ 58-61; 63-67.)  As a result of these allegations, and the fact that there were no Board meetings, the Committee argues that Holdings's corporate independence was illusory and was interposed to protect Bay Harbour and York from the consequences of their own actions.

While Bay Harbour and York put a lot of stock in the fact that Holdings was an LLC, and so corporate formalities need not be observed, "emerging caselaw illustrates that situations that result in a piercing of the limited liability veil are similar to those that warrant piercing the corporate veil." *Netjets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 176 (2d Cir. 2008). Indeed, as one treatise put it: "Every state that has enacted LLC piercing legislation has chosen to follow corporate law standards and not develop a separate LLC standard." *Id.* (citing J. Leet, J. Clarke, P. Nollkamper & P. Whynott, *The Limited Liability Company* § 11:130 at 11-9 (rev. ed. 2007)). Nevertheless, in the LLC context, "somewhat less emphasis is placed on whether the LLC observed internal formalities because fewer such formalities are legally required." *Id.* at 178. Indeed, the Delaware Limited Liability Company Act (DLLCA) requires little more than that an LLC execute a proper certificate of formation, maintain a registered office in Delaware, have a registered agent for service of process in Delaware, and maintain certain records for membership and tax purposes. DEL. CODE ANN. tit. 6, § 18-101 *et seq.* (2009). Furthermore, whereas the Delaware General Corporations Law requires a corporation to be managed by a Board of Directors, unless the certificate of incorporation otherwise provides, the director of a corporation must be a "natural person." 8 Del. Code Ann. § 141; 1 William Meade Fletcher, FLETCHER CYC. OF THE LAW OF PRIVATE CORP. § 307.20. However, the DLLCA permits non-natural persons (including another limited liability company or a corporation) to serve as Managers of an LLC. *See* 6 Del.Code Ann. tit. 6 §§ 18-101; 18-401.

It is well-established that wholly-owned subsidiaries may share officers, directors and employees with their parent, without requiring the court to infer that the subsidiary is a mere instrumentality for the parent and without requiring the court to conclude that those officers and directors were not functioning properly. *See Milner v. TPAC LLC (In re Ticketplanet.com)*, 313

B.R. 46, 71 (Bankr. S.D.N.Y. 2004) (Gropper, J.) ("*Ticketplanet*") (dismissing piercing corporate veil claim, because "[a]n overlap in ownership, officers and directors and responsibilities is not uncommon or impermissible"); *Japan Petrol. Co. (Nig.) Ltd. v. Ashland Oil Inc.*, 456 F. Supp. 831, 841 (D. Del. 1978) (finding that common officers and directors between a parent and a subsidiary is no indication that the "parent corporation dominates the activities of the subsidiary"). As the Supreme Court recognized, "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." *United States v. Bestfoods*, 524 U.S. 51, 69 (1998) (citing *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 57 (2d Cir. 1988)).

That Holdings's parents retained decision-making authority is also insufficient to pierce the corporate veil. "Since courts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary . . . it cannot be enough to establish liability here that dual officers and directors made policy decisions and supervised activities at the facility." *Id.* at 69-70 (citations omitted). Courts refuse to pierce the veil just because parent corporations retain decision-making authority over subsidiaries. *See Fletcher*, 68 F.3d at 1459-60 (finding that district court did not err when it found no domination by parent just because parent's approval was required for real estate leases, major capital expenditures, negotiations for a sale of minority stock ownership, or the fact that the parent played a significant role in the ultimate sale of subsidiary's assets to a third party); *Akzona Inc. v. E.I. Du Pont De Nemours & Co.*, 607 F. Supp. 227, 238 (D. Del. 1984) (holding that evidence of 100% ownership of subsidiaries, the requirement that parent approve capital expenditures greater than $850,000, parent arranging financing for the subsidiary, and some overlap in the boards did

not support veil-piercing); *Kramer Motors, Inc. v. British Leyland, Ltd.,* 628 F.2d 1175, 1177

(9th Cir. 1980) (refusing to infer the subsidiary was alter ego of parent, even though the parent

had "general executive responsibilities" for the operations of the subsidiary, approved major

policy decisions, guaranteed the subsidiary's bank loans and worked closely with the subsidiary

on approving decisions, and some directors of the parent served as directors of the subsidiary

while the president of the subsidiary had served as a director of the parent).  Also, in *Foxmeyer*,

the court noted that evidence with respect to observing corporate formalities was "frankly

equivocal at best" where there was a certain overlap in ownership, officers, directors, and

personnel between the parent and its subsidiary, both entities used common office space,

addresses, and telephone numbers, but the subsidiary maintained corporate records, elected

directors, held board meetings and compiled minutes for such meetings, and the Trustee

"question[ed] the sincerity of such records, elections, and meetings."  *Foxmeyer,* 290 B.R. at

245.  Still, the court determined that the "corporate formalities" factor of a veil-piercing analysis

did not weigh in favor of piercing the corporate veil because the court "would expect to see . . .

the aforesaid overlap between the Debtors in the items to which the Trustee points the Court."

*Id.* at 246.

At the same time, in *Valley Finance, Inc. v. United States*, cited by the district court in

*Golden Acres, Inc.*, the corporation was solely owned by a single individual, who made all major

corporate decisions, there was doubt as to whether a Board of Directors existed for part of the

corporation's existence, the Board "played no meaningful role," directors met infrequently and

approved corporate decisions and policies without discussion or question, but the individual

owner also used corporate funds and staff for his own private purposes, the court permitted veil-

piercing.  *Valley Finance, Inc. v. United States,* 629 F.2d 162, 172 (D.C. Cir. 1980); *Golden*

*Acres, Inc.*, 702 F. Supp. at 1105-06.  Similarly, in *Golden Acres, Inc.*, the court pierced the

corporate veil after analyzing numerous factors identified in *Pisani*, 646 F.2d at 88, including

the "admittedly nominal role" of a closely held corporation's president, the "correspondingly

one-sided nature" of the "directors meetings," and a general disregard of corporate formalities.

*Golden Acres, Inc.*, 702 F. Supp. at 1106.

Here, Holdings is an LLC, not a closely held corporation.  Furthermore, even though at

all relevant times the only Manager of Holdings was the direct parent, Intermediate Holdco, or

the indirect parent, Holdco, and thus, there was no board of managers, at least one court has

determined that the lack of officers and directors in a subsidiary LLC is not a "persuasive veil-

piercing factor." *Capricorn Investors III, L.P. v. Coolbrands Intern., Inc.*, 2009 WL 2208339 at

*5 (N.Y. Sup. 2009) (applying New York law).  In *Capricorn Investors, III, L.P.*, the court

determined that "Plaintiff's assertion that [the LLCs] have no officers or directors, and did not

hold board or executive committee meetings are not persuasive veil piercing factors for an LLC,

where plaintiff does not argue that management was required to be centralized in a board." *Id.*[7]

While presumably it was impossible for the sole managing member of Holdings (Holdco or

Intermediate Holdco) to make decisions wearing anything other than their "parent hats," because

of their own duties to their members (which, at least in the case of Holdco, includes defendants

BHS&B, Inc. and YSOF Investor, LLC ("Lead Member Holders"), and defendants Hilco SB,

LLC, Shore and Prevor (Swanson Aff., Ex. 2, at 8)), the DLLCA permits "Members" to be other

---

[7]    While Delaware and not New York law is applicable here, other courts have found there is little difference in
applicable veil-piercing standards between the two states.  While New York courts disregard a party's corporate veil
"reluctantly," as in Delaware, a corporation will be held liable on an alter ego theory when it has exercised complete
domination over another corporation and used that domination to commit a fraud or wrong that injured the plaintiff.
*Dover Ltd. v. A.B. Watley, Inc.*, 2006 WL 2987054, *9 (S.D.N.Y. 2006).

LLCs or corporations, impliedly permitting those LLCs or corporations to serve in an entity

capacity in which they continue to owe fiduciary duties to their own Members.

Other allegations made by the Committee do not support an inference that Holdings did

not observe corporate formalities.  None of the allegations suggest impropriety or abuse of the

corporate form.  The failure to hold board meetings does not support piercing, because under the

DLLCA, Holdings did not have to hold board meetings or observe other formalities.  Indeed, it is

not at all odd that a board meeting was not held in Holdings's brief life between the August 2008

acquisition and the November 2008 bankruptcy.

The remaining allegations with respect to the officers of Holdings—that Holdings lacked

a CEO until a few weeks before the bankruptcy filing, that CFO functions were outsourced to a

company that reported directly to Bay Harbour, and that management was generally kept in the

dark—are either (1) not required under the DLLCA, and so are insufficient to support a finding

of total domination and control sufficient to pierce the corporate veil, or (2) too conclusory to

survive a motion to dismiss.  In short, the Committee has failed to plead adequate facts

supporting an inference that Holdings's failure to observe corporate formalities is so severe as to

overcome the presumption that it was independent from its parents.

> c.      Whether Holdings Was a Façade for Its Parents and Equity and Fairness Require
> Piercing the Corporate Veil

Finally, the Committee alleges generally that Holdings was but a mere façade for Bay

Harbour and York to achieve a quick profit while protecting themselves from a downturn by

secretly planning to liquidate as quickly as possible should things go wrong.[8]  The Committee

---

[8]    Simply going out of business, even if caused by malfeasance, is not enough to support piercing.  *See Cuthill v. Kime (In re Evergreen Sec., Ltd.)*, 319 B.R. 245, 255-56 (Bankr. M.D. Fla. 2003) (holding that plaintiff failed to prove that defendant used company as an alter ego when the company was not set up to perpetrate a fraud, but was a legitimate family business).

appears to make this allegation to comply with both factors required to pierce the veil—that there was a "single economic entity," and an "overall element of fraud or injustice."

Under Delaware law, the corporate veil will be pierced only if the defendants used the corporate structure itself to further the fraud or injustice; the "underlying cause of action, at least by itself, does not supply [it]." *Foxmeyer*, 290 B.R. at 236; *Mobil Oil*, 718 F. Supp. at 268.  In other words, "the plaintiff must plead facts showing that the corporation is a sham and exists for no other purpose than as a vehicle for fraud." *RSL*, 2003 WL 22989669, at *15 (citing *Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999)).  "The extent of the domination and control must preclude the controlled entity from having legal or independent significance of its own.  There must be an abuse of the corporate form to effect a fraud or an injustice—some sort of elaborate shell game.  To survive a motion to dismiss, a plaintiff must allege facts that the controlling owners operated the company as an 'incorporated pocketbook' and used the corporate form to shield themselves from liability." *Ticketplanet*, 313 B.R. at 70.

The Committee's allegations here are virtually identical to the allegations that numerous courts have found insufficient and dismissed.  For example, in *RSL*, the plaintiffs relied on the following factors to argue that the corporate subsidiary was a sham and that its corporate veil should be pierced:  (1) the subsidiary was undercapitalized and insolvent since its inception; (2) there was significant overlap in management between the parent and the subsidiary; (3) directors of the parent had ownership interests in the subsidiary; (4) the subsidiary never had a sustainable financial business, and was reliant on the parent for financing; (5) the parent provided managerial services and its officers directed the day-to-day operations of the subsidiary, exercising "de facto" or "effective control" over the affairs of the subsidiary and its directors; and (6) the subsidiary served as a tool to further the interests of the defendants. *RSL*, 2003 WL

22989669, at *16.  Judge Gropper noted: "[A]bsent an allegation of direct injury to the corporation, or a diversion of goods or services from the company, it cannot be presumed that the alleged wrongful concealment of [the subsidiary's] insolvency harmed or injured [the subsidiary]."  *Id.* at *5.

Judge Gropper pointed out that there was no "de facto control" of the subsidiary by the parents to pierce the veil because "at least several directors for [the subsidiary] were not directors of either [parent].  *Id.* at *14 (citing *see Odyssey Partners, L.P. v. Fleming Cos., Inc.,* 735 A.2d 386 (Del. Ch.1999); *Aronson v. Lewis,* 473 A.2d 805, 815-16 (Del. 1984), overruled on other grounds, *Brehm v. Eisner*, 746 A.2d 244 (2000)).  In *Odyssey Partners*, the Delaware Chancery Court determined that a majority shareholder did not exercise de facto control over the board of directors of a corporation in such a manner as to "frustrate or foil" the corporation's efforts to raise needed financing or capital, in order to protect its position as controlling shareholder.  *Odyssey Partners*, 735 A.2d at 406.  The court noted that board members were, among other things, a former officer of the majority shareholder and its designee, had a "consulting agreement" with the majority shareholder by which the compensation was not significant and generous, participated in lobbying efforts with respect to a proposal of the majority shareholder and scheduled meetings at the majority shareholder's offices.  *Id.* at 408-09.  Also, in *Aronson v. Lewis*, the Court found that a 47% stockholder did not exercise control over the board with respect to the plaintiff's claim of demand futility in the context of a derivative action where plaintiff alleged the stockholder "personally selected" each director, and the board approved an agreement which the plaintiff alleged constituted a breach of fiduciary duty.  *Aronson*, 473 A.2d at 815 (internal citation omitted).  The court determined "a plaintiff charging domination and control of one or more directors must allege particularized facts

33

manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling." *Id.* at 816 (internal quotation marks and citation omitted). Here, there is no issue of demand futility nor does it matter whether Holdco or Intermediate Holdco, through their boards, were exercising de facto control of the subsidiary; the DLLCA did not require the Holdings to have a board of managers made of independent natural persons; it permitted Holdings's parents, Holdco and then Intermediate Holdco, to be the sole Manager.

Similarly, in *Trevino*, conclusory allegations that (1) a subsidiary was not wholly independent of its parent, (2) that it was under the utter and complete domination and control of its parent, and (3) that it was formed for the purpose of facilitating the parents' business and limiting their liability were found insufficient to survive a motion to dismiss, because they did not show how the defendants abused or caused in an injustice with the use of the corporate form. *Trevino*, 583 F. Supp. 2d at 529-31. Finally, in *Ticketplanet.com*, the chapter 7 trustee alleged that (1) there was significant overlap in the directors of the parents and debtor and other subsidiaries; (2) the parent's principal had an ownership interest in all of the entities; (3) the parent's principals were affiliated with an intermediate company, and became involved in the debtor's operations; and (4) the parent's principals, through an intermediary, dominated and controlled the debtor for their own personal gain and used the debtor and another subsidiary as an incorporated pocketbook. *Ticketplanet.com*, 313 B.R. at 71. Judge Gropper dismissed the complaint because the allegations did not demonstrate that "there was an overall element of injustice or unfairness present that arose from abuse of the corporate form. An overlap in ownership, officers and directors and responsibilities is not uncommon or impermissible." *Id.*

These cases all show that allegations such as the Committee's here are insufficient to survive a motion to dismiss, because even if true they would not rise to the level of injustice or fraud that would justify disregarding the corporate form. Here, the Committee merely alleges "deception of creditors concerning the Debtor's plans and prospects for operating as a going concern." (Compl. ¶ 68.) In addition, the Complaint's allegations—specifically, that Holdings was formed for a legitimate business purpose and that it had $55 million in cash-on-hand to fund operations—undermine any veil-piercing claim the Committee could come up with. Therefore, the veil-piercing claim is dismissed with prejudice.[9]

### D.    Breach of Fiduciary Duties

Even if the Committee has pleaded facts sufficient to overcome dismissal of its piercing claim, it cannot adequately plead facts required for breach of fiduciary duty claims. The

---

[9]    Another line of Delaware cases permits veil-piercing in the parent-subsidiary context based on agency theory. *Trevino*, 583 F. Supp. 2d at 531 (citing *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*, 842 F.2d 1466, 1477 (3d Cir. 1988)). The plaintiff must allege "an arrangement between the two corporations so that one acts on behalf of the other and within usual agency principles," and "the arrangement [is] relevant to the plaintiff's claim of wrongdoing." *Id.* "A difference in corporate powers between a parent corporation and a subsidiary is an obstacle to finding an agency relationship or disregarding the corporate entity." *Japan Petrol. Co. (Nig.) Ltd.*, 456 F. Supp. at 841. Furthermore, the plaintiff must allege control that is "actual, participatory and total." *Id.* "The fact that a creditor corporation takes an active part in the management of a debtor corporation does not indicate the necessary control." *Id.* For example, in *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*, the court remanded the matter to the district court for it to make factual findings whether the parent and the subsidiary entered into a limited agency relationship for a specific transaction where the subsidiaries were wholly-owned by the parents, they shared common officers and directors, and the parents were involved in substantial financial decisions of the subsidiaries, where, among other things, the subsidiaries kept separate books and records and were completely responsible for their day-to-day operations in the foreign country. *Phoenix Canada Oil Co. Ltd.*, 842 F.2d at 1478. However, in *Japan Petroleum Corp.*, the court found no agency liability where the parent was active administratively and monetarily in starting the operations of its subsidiary in Nigeria, most of the parent and subsidiary officers were the same, the parent provided consulting services to the subsidiary, expenditures over $250,000 required parent approval, the parent paid the salaries of all the subsidiary's non-Nigerian employees, guaranteed three bank loans, and the parent indicated in its annual report that the operations of its subsidiary were actually its operations. *Japan Petrol. Co. (Nig.) Ltd.*, 456 F. Supp. at 842-43. Here, the Committee has not pleaded any agency theory of liability against Holdco or any other defendant (or Intermediate Holdco). Furthermore, while Holdco may have been established for a similar purpose as Holdings, as it is clear from their websites, at least the Bay Harbour and York Defendants have different addresses and places of business than Holdings. (Compl. ¶¶ 1-12.) Furthermore, with respect to Holdco and Intermediate Holdco, there is no indication there was any limited agency relationship or general agency relationship with respect to the events that took place here; as the sole member and Manager of Holdings, Intermediate Holdco and Holdco were entitled to protect their own interests.

Committee alleges two counts of breaches of fiduciary duties.  First, the Committee alleges that

Holdco and the Bay Harbour and York Employee Defendants breached their duties of care,

loyalty, and good faith to Holdings.[10]  Second, the Committee alleges that Sugarman and Todd,

Holdings' President and COO, breached their duties of care to Holdings.[11]  The Court takes each

cause of action in turn.

> 1.      *Standard for Breach of Fiduciary Duty Causes of Action Under Delaware Law*

"The directors of Delaware corporations have a triad of primary fiduciary duties: due

care, loyalty, and good faith."  *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001); *Malone*

*v. Brincat*, 722 A.2d 5, 10 (Del. 1998).  The elements of a breach of fiduciary duty claim are (1)

that a fiduciary duty exists and (2) that the fiduciary breached that duty.  *York Linings v. Roach*,

1999 WL 608850, at *2 (Del. Ch. July 28, 1999); *see also The Responsible Person of Musicland*

*Holding Corp. v. Best Buy Co. (In re Musicland Holding Corp.)*, 398 B.R. 761, 786 (Bankr.

S.D.N.Y. 2008) (Bernstein, C.J.)("*Musicland*").

> 2.      *Breach of Fiduciary Duties by the York and Bay Harbour Employees*

> a.      <u>The Bay Harbour and York Employee Defendants Do Not Owe A Fiduciary Duty
> to Holdings</u>

---

[10]    While the Committee alleges that Holdco owed Holdings duties of care, loyalty, and good faith (Compl. ¶ 71),
and it argues in its opposition papers that Holdco breached those duties, it does not plead any allegations of a breach
in the Complaint.  It is well settled that a party may not amend its complaint by virtue of its opposition papers.
*Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (internal citations omitted); *Frederico v. Home
Depot*, 507 F. 3d 188, 201-02 (3rd Cir. 2007).  Accordingly, the breach of fiduciary duty claim against Holdco is
dismissed with prejudice.  Furthermore, the Committee argues in its opposition that Holdco may have aided and
abetted York's and Bay Harbour's alleged breaches.  The Complaint contains no cause of action for aiding and
abetting breach of fiduciary duty.  Accordingly, any aiding and abetting breach of fiduciary duties argument by the
Committee is disregarded.  Furthermore, the Committee makes no allegations of breaches of fiduciary duties against
Intermediate Holdco either in its opposition papers or the Complaint, and the Court will not consider any such
argument.

[11]    As with Holdco, even though the Committee alleges that Todd and Sugarman owed Holdings separate duties of
care, loyalty, and good faith, the Committee only pleads a breach of the duty of care.  The Court therefore only
considers that cause of action.

Absent a provision to the contrary, "the manager of an LLC owes the traditional fiduciary duties of loyalty and care to the members of the LLC." *Bay Center Apartments Owner LLC, v. Emery Bay PKI, LLC*, 2009 WL 1124451, *8 (Del. Ch. Apr. 20, 2009). For example, in *Bay Center Apartments Owner LLC*, defendant PKI, an LLC, was the managing member of another LLC defendant, Emery Bay. *Id.* at *1. PKI was owned and managed by an individual, Alfred Nevis. The project for which Emery Bay was formed was a joint venture between PKI and plaintiff Bay Center LLC. *Id.* Emery Bay's LLC Agreement contemplated that PKI would be responsible for managing the project, but the parties defined those responsibilities through a separate agreement, the "Development Management Agreement," by which one of PKI's designated affiliates, defendant ETI, another LLC, was bound. *Id.* ETI's only counterparty to the Development Management Agreement was a wholly-owned subsidiary of Emery Bay. *Id.* The court found that the plaintiff adequately pled that PKI breached its fiduciary duties to Emery Bay, "[a]nd Nevis, as the human who directly managed Emery Bay for PKI, had a fiduciary duty not to use his control over Emery Bay's assets to benefit himself at Emery Bay's expense," where "Nevis . . . renegotiat[ed] [a] Loan to advantage himself personally at the expense of Emery Bay." *Id.*

At the same time, "[p]arent corporations do not owe [wholly-owned] subsidiaries fiduciary duties. This is established Delaware law." *Trenwick Am. Lit. Trust v. Ernst & Young LLP*, 906 A.2d 168, 173 (Del. Ch. 2006). "A wholly-owned subsidiary is to be operated for the benefit of its parent." *Id.* at 174. "Although it is said in general terms that a parent corporation owes a fiduciary obligation to its subsidiaries, this obligation does not arise as such unless the subsidiary has minority stockholders." *Id.* at 192 n.66. Even when directors sit on the board of a wholly-owned subsidiary, "the fiduciary duties owed" run to the parent, not the subsidiary: "in a

parent and wholly-owned subsidiary context, directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders." *Id.* at 200 (citing *Anadarko Petroleum Corp. v. Panhandle Eastern Corp.*, 545 A.2d 1171, 1174 (Del. 1988)). As a result, "Delaware law does not embrace the concept that a director of a wholly-owned subsidiary owes a duty to second-guess the business judgment of its parent corporation when following and supporting the parent's strategy would not violate any legal obligation the subsidiary owes to another." *Trenwick*, 906 A.2d at 201.

> b.    The Court May Arguably Consider Exculpatory Provisions at the Motion to Dismiss Stage

The Holdco Operating Agreement contains an exculpatory provision, which exculpates Holdco's directors from liability based on a breach of fiduciary duty of care.[12] Under § 102(b)(7) of the Delaware General Corporation Law, shareholders may exculpate directors and officers for liability arising from a breach of fiduciary duty of care.[13] These are enforceable under Delaware

---

[12]    As noted *supra*, Section 3.12(g) of Holdco's LLC Agreement states that "[n]o Manager shall be liable to the Company or any Member or Economic Owner for monetary damages for breach of fiduciary duty as a Manager; provided that the foregoing shall not eliminate or limit the liability of a Manager: (i) for any breach of such Manager's duty of loyalty to the Company or its Unitholders (as such duty is modified pursuant to the terms of this Agreement); (ii) any acts or omissions that constitute fraud, willful misconduct, bad faith or gross negligence in the conduct of such Manager in his capacity as a Manager of the Company, or (iii) for any transaction from which such Manager derived an improper personal benefit." (Einstein Aff., Ex. B.) Similarly, Section 7 of the Holdings LLC Agreements provides, in each agreement with the exception of the original LLC Agreement, "[t]he Company shall indemnify and hold harmless the Member, the agents of the Company and their respective heirs, successors, executors, administrators, legal representatives and assigns, from and against (and none of them shall be liable for) any loss, cost, expense (including attorneys' fees), judgment or liability incurred by or imposed upon such person in connection with any action, suit or proceeding (including any proceeding before any administrative or legislative body or agency) to which such person may be a party or otherwise be involved or with which such person shall be threatened by reason of being or having been the Member, or having served the Company as an agent of the Member, or participating in the conduct of the business of the Company at the direction of the Member, provided that such person shall not be so indemnified to the extent such cost, expense, judgment or liability shall have been finally determined in a decision on the merits in any such action, suit or proceeding to have been incurred or suffered by such person by reason of his or her gross negligence, willful breach of this Agreement or willful violation of law." (Einstein Aff. Ex. A; Dahan Aff. Exs. S and E.)

[13]    Section 18-1101 of the DLLCA similarly permits members or managers to adopt provisions eliminating or limiting "any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is

law as against claims for breaches of the fiduciary duty of care. *See Trenwick*, 906 A.2d at 192.

The Court may take judicial notice of an exculpatory provision at the motion to dismiss stage.

*See, e.g.*, *Malpiede v. Townson*, 780 A.2d 1075, 1091-93 (Del. 2001) (holding that chancery

court properly considered exculpatory provision on motion to dismiss under *Del. Ch.* Ct. R.

*12(b)(6),* because "[w]hen the issue is confined to the legal effect of a Section 102(b)(7) charter

provision, it is difficult to envision what discovery would be implicated"); *Hokanson v. Petty*,

2008 WL 5169633, at *5 (Del. Ch. Dec. 10, 2008) (taking judicial notice of exculpation clause,

granting motion to dismiss breach of fiduciary duty of care claim under Del. Ch. Ct. R. 12(b)(1));

*IT Litig. Trust v. D'Aniello (In re IT Group)*, 2005 WL 3050611, at *11-12 (D. Del. Nov. 15,

2005) (considering exculpatory provision on appeal of motion to dismiss and noting that a Del.

Stat. Ann. §102(b)(7) bar can be raised on a Fed. R. Civ. P. 12(b)(6) motion to dismiss, a motion

for judgment on the pleadings, or in a motion for summary judgment).

Delaware courts have found that the standard in Delaware for breach of the duty of care

is "gross negligence," and, thus the Exculpatory Clauses in the Holdco and Holdings LLC

Agreements would not apply to eliminate the duty of care. *See Brehm v. Eisner*, 746 A.2d 244,

---

a party to or is otherwise bound by a limited liability company agreement" with the exception of liability for "any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing." DEL. CODE ANN. tit. 6, § 18-1101(e). Even creditors may be "otherwise bound" by an LLC agreement that expressly waives fiduciary duties as between the LLC's members. *See North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92, 100-02 (Del. 2007) ("[w]hen a corporation is insolvent . . . its creditors take the place of the shareholders as the residual beneficiaries;" and creditors have many opportunities to protect their rights, "among which are the protections afforded by their negotiated agreements, their security instruments, the implied covenant of good faith and fair dealing, fraudulent conveyance law, and bankruptcy law" ); Mark M. Maloney and Michelle L. Carter, *Asserting Breach-of-fiduciary-duty Claims in the Context of Delaware LLCs*, Am. Bankr. Inst. J., Vol. XXVIII, No. 7, September 2009, at 36, 86, 86 n.2 ("By stepping into equityholders' shoes, creditors would be bound by the LLC agreement's provisions governing fiduciary duties, subject to the implied covenant of good faith and fair dealing, tit. 6 §18-1101(c)," and, "the authors agree that a Delaware LLC can probably accept, adjust or deny fiduciary duties to creditors through its LLC agreement."). In this case, however, the Holdco Operating Agreement limited the Bay Harbour Board Manager's fiduciary duties to Holdco or its Unitholders to the type of fiduciary duties of loyalty and due care owed by directors and officers of a business corporation under the Delaware General Corporation Law. Holdco Company Agreement § 3.12(d) at 26. Therefore, an analysis of the fiduciary obligations in light of the Delaware General Corporation Law is necessary.

259 (Del. Supr. 2000).  Still, as described below, the Committee cannot plead any breaches of

fiduciary duties by either the Bay Harbour and York Employee Defendants or by Sugarman and

Todd regardless of whether the Exculpatory Clauses apply to any breaches of the duty of care.

>  c.    Even if the Bay Harbour and York Employee Defendants owe fiduciary duties to
>  Holdings, the Committee has not adequately pled breaches of fiduciary duties of care or
>  loyalty

>  i.    Duty of Care

"The fiduciary duty of due care requires that directors of a Delaware corporation use that

amount of care which ordinarily careful and prudent men would use in similar circumstances,

and consider all material information reasonably available in making business decisions, and that

deficiencies in the directors' process are actionable only if the directors' actions are grossly

negligent."  *In re Walt Disney Co. Deriv. Litig.*, 907 A .2d 693, 749 (Del. Ch. 2005) (internal

quotation marks omitted).  Under Delaware law, "[t]o show a breach of the duty of care,

plaintiffs must overcome the presumption, known as the business judgment rule, that the

defendant directors have acted on an informed basis and in the honest belief they acted in the

best interest of the corporation."  *CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd.*, 2007

WL 2915181, at *3 (S.D.N.Y. Oct. 4, 2007).  "[B]usiness failure is an ever-present risk.  The

business judgment rule exists precisely to ensure that directors and managers acting in good faith

may pursue risky strategies that seem to promise great profit."  *Trenwick*, 906 A.2d at 194;

*Rabkin v. Philip A. Hunt Chemical Corp.*, 547 A.2d 963, 972 (Del. Ch. 1986) (noting that

without factual allegations that support the allegation that a board's decision was uninformed or

grossly negligent, mere dissatisfaction about how directors exercised their business judgment

does not state a claim).  "What Delaware law does not do is to impose retroactive fiduciary

obligations on directors simply because their chosen business strategy did not pan out."

*Trenwick*, 906 A.2d at 173.

"In order for plaintiffs' duty of care claims to survive a motion to dismiss, they must sufficiently plead facts which if true would take defendants' actions outside the protection afforded by the business judgment rule." *Crescent Mach I Partners L.P. v. Turner*, 846 A.2d 963, 984 (Del. Ch. 2000). This has been called "pleading around the business judgment rule." *Stanziale*, 416 F.3d at 238. "To overcome the presumption of the business judgment rule, plaintiffs bear the burden to show that the defendant directors failed to act (1) in good faith; (2) in the honest belief that the action was in the best interest of the corporation; or (3) on an informed basis." *Crescent Mach I Partners L.P.*, 846 A.2d at 984 (citing *Aronson*, 473 A.2d at 812). If a party demonstrates that there was neither a business decision, nor disinterestedness and independence, nor due care, nor good faith was present, the burden of proof shifts to the defendant to show the entire fairness of a transaction. *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989). "Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task." *Stanziale*, 416 F.3d at 238.

Still, "[t]he protection of the business rule can only be claimed by disinterested directors whose conduct otherwise meets the tests of business judgment"; accordingly, "a director can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Musicland*, 398 B.R. at 788 (citing *Aronson*, 473 A.2d at 812). More specifically, in order for the court to apply an entire fairness standard of review, the plaintiff must show that a majority of the directors "were either self-interested or dominated by an interested party," or the only explanation for their conduct is bad faith. *Crescent Mach I*

*Partners L.P.*, 846 A.2d at 981; *see also Stanziale*, 416 F.3d at 238.  "Bad faith," which is

subsumed in both the fiduciary duty of care, and the fiduciary duty of loyalty discussed *infra,* is

"not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong

because of dishonest purpose or moral obliquity; it is different from the negative idea of

negligence in that it contemplates a state of mind affirmatively operating with furtive design or

ill will."  *Roselink Investors, L.L.C.*, 386 F. Supp. 2d at 221 (citing *Desert Equities, Inc. v.*

*Morgan Stanley Leveraged Equity Fund, II, L.P.,* 624 A.2d 1199, 1202, 1208 n.16 (Del.1993)).

For example, in *Desert Equities, Inc.*, the plaintiff was granted an opportunity to replead bad

faith claims with particularity where it alleged that the defendant general partner acted with bad

faith in exercising its excusal authority to exclude the plaintiff from further participation in one

partnership, where the plaintiff asserted that the general partner did so in retaliation for

plaintiff's filing of the another suit with respect to another partnership.

"Alternatively, a plaintiff may overcome the presumption that directors and officers acted

on an *informed basis* by establishing that a decision was the product of an irrational process *or*

that directors failed to establish an information and reporting system reasonably designed to

provide the senior management and the board with information regarding the corporation's legal

compliance and business performance, resulting in liability."  *Stanziale*, 416 F.3d at 238

(emphasis in original).

For example, in *Crescent Mach I Partners L.P.*, the court found that the business

judgment rule was not violated where the board of directors approved a financial advisor's

evaluation of the fairness of a merger, even though the advisor was a managing director of an

entity that was compensated to evaluate the merger.  *Crescent/Mach I Partners, L.P.*, 846 A.2d

at 980.  The court found that the advisor and the entity's interests were completely aligned with

the interests of the stockholders in attempting to maximize the value of the interest of the corporation and the stockholders. *Id.* at 980. Similarly, in *CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd.*, the plaintiff "was organized solely for the purpose of acting as a creditors' litigation trust pursuant to a confirmed Chapter 11 plan in a bankruptcy case . . . which involved the reorganization of [Universal], a Delaware holding corporation, and (b) Universal's wholly owned Delaware operating subsidiary [Glenoit], a garment manufacturing company." *CVC Claims Litigation LLC*, 2007 WL 2915181, at *3 (internal quotation marks omitted). The complaint alleged that two entity defendants breached "a written pre-petition commitment to finance a pre-packaged plan of reorganization" for Glenoit and Universal, in addition to contending that an individual defendant who was alleged to be an officer of one of the entity defendants, as well as that defendant's senior representative on the boards of directors of Universal and Glenoit, breached his fiduciary duties to Glenoit and its creditors. *Id.* The court found that the plaintiff did not meet its burden under the business judgment rule with respect to the duty of care by "only cursorily argu[ing] that to the extent that [entity defendants] were planning to end their involvement with the garment industry, [individual defendant's] failure to question their commitment to Glenoit amounts to a failure to act on an 'informed basis." *Id.* (internal quotation marks omitted).

In *Stanziale*, the court, applying Delaware law, found that the plaintiff failed to overcome the good faith prong of the business judgment test for alleged breaches of fiduciary duties against officers and directors of an airline where "[the directors] declin[ed] to repair [airline's airplanes'] jet engines and instead replacing them with new engines." *Stanziale*, 416 F.3d at 238-42. However, the court did not dismiss breach of fiduciary duty claims based on allegations that (1): "officers did nothing when they were told by the corporate Director of Safety of quality

assurance problems with aircraft maintenance and of failures to record maintenance and repair work," as "[u]nder no circumstances should aircraft maintenance problems be ignored.  Lives are on the line . . . the only explanation [for the alleged passivity] is bad faith."  *Id.*  In addition, while the terms of the decision to not repair the jet engines and instead replace them with new engines were protected by the business judgment rule, "the directors' inattention when writing multi-million dollar checks may have been intentional, willful . . . and malicious" as alleged in the complaint, as "board minutes reflect that the aircraft engine outlays were made with no discussion."  *Id.* (internal quotation marks omitted).  Furthermore, the plaintiff adequately pled around the business judgment rule by alleging "officers failed to process used airline tickets worth one million dollars," and the "[airline's] Santo Domingo Route was established and maintained 'purely to please' [the Chairman of the Board/CEO/Director/Founder]'s family."  *Id.*

Here, even if the Exculpatory Clauses did not defeat the duty of care claim, and even assuming that the York and Bay Harbour Employee Defendants owed such a duty to a wholly-owned subsidiary, the Complaint does not raise a plausible inference that the Bay Harbour and York Employee Defendants breached their duties of care.  Here, the Committee has failed to allege that the Bay Harbour and York Employee Defendants were interested in the alleged wrongful transactions: there are neither allegations they were on both sides of any transaction, nor allegations they expected to derive a personal financial benefit from any transaction, as opposed to a benefit devolving upon Holdings or all Members (i.e., Holdco or Intermediate Holdco).  Furthermore, the Committee has not demonstrated that the Bay Harbour and York Employee Defendants failed to act (1) in good faith; (2) in the honest belief that the action was in the best interest of the corporation; or (3) on an informed basis.

Specifically, the Committee alleges that the wrongful "transactions" constituting breaches of fiduciary duties by the Bay Harbour and York Employee Defendants included: (1) removing Shore and Prevor from any management position; (2) not engaging a CFO; (3) not engaging a CEO until it was too late to effect any meaningful management change prior to bankruptcy; (4) failing to exercise due care in planning for the possibility that Abelco would demand payment of all or part of its loan and/or seeking alternative funding sources; (5) failing to exercise due care in planning for a possible shortfall and/or seeking alternative funding sources with respect to the assumption that existing inventory could be liquidated for estimated proceeds; (6) failing to exercise due care in requiring management to demonstrate a sound plan for timely acquisition of merchandise for Fall 2008 held at ports on account of the first Bankruptcy Case; (7) failing to exercise due care in requiring management to demonstrate a sound plan, and/or authorizing any purchases, with respect to merchandise for the Fall 2008 season other than what was held at ports on account of the first Bankruptcy Case; (8) failing to exercise due care in requiring management to prepare an effective plan to move merchandise between liquidating and going-forward stores and/or an alternative plan for obtaining necessary merchandise in time for the Fall 2008 season; (9) intentionally refusing to authorize expenditure of funds on merchandise for the Spring 2009 season and failed to plan or budget funds for such purpose; and (10) intentionally restricting the authority of Debtor's President and its Chief Operating Officer to manage the Debtor's business and failed to exercise due care in keeping them advised of important funding issues and related strategic decisions.  (Compl. ¶ 72.)

None of these allegations indicate that the Bay Harbour and York Employee Defendants were standing on both sides of any transaction; if anything, the very fact that the Committee alleges the Bay Harbour and York Employee Defendants "failed to requir[e]" certain activities

of Holdings' officers and failed to engage certain officers indicates that the Committee is alleging that the Bay Harbour and York Employee Defendants should have been on both sides of the transactions.  Accordingly, the only claim in which the Committee arguably alleges the Bay Harbour and York Employee Defendants were on both sides of the transaction, by removing Prevor and Shore from Holdings's management, cannot stand either.  Also, as Holdco was the sole Member and sole Manager of Holdings at some point, the Holdings's LLC Agreements contemplated that the Bay Harbour and York Employee Defendants would be permitted to remove individuals from Holdings's management.

Furthermore, none of the Committee's allegations indicate that the Bay Harbour and York Employee Defendants expected to derive personal financial benefits from any transaction, as opposed to benefits devolving upon Holdings or all members (i.e., Holdco or Intermediate Holdco); the Bay Harbour and York Employee Defendants would not benefit if Abelco demanded payment of all or part of its loan, nor would they benefit individually by failing to provide merchandise for the Fall 2008 or Spring 2009 season in Steve & Barry's stores.

Furthermore, the Committee has failed to allege that the alleged wrongful transactions could be explained by nothing other than "bad faith," or that the decisions were not made on an "informed basis."  While there may have been no board meetings, Holdings had a very limited existence.  There is nothing to indicate the Bay Harbour and York Employee Defendants were making decisions with inattention or such that the only explanation for such decisions was "bad faith."  The Complaint merely alleges that the Bay Harbour and York Employee Defendants failed to "plan" for certain possibilities; it makes conclusory claims that they failed to keep Debtor's President and Chief Operating Officer advised of important funding issues and strategic decisions.  This is not the equivalent of "engine outlays with little or no discussion," or

46

"failing to process one million dollars of unused airline tickets." Instead, their not "plan[ning]" for certain possibilities has another explanation other than "bad faith"—the Bay Harbour and York Employee Defendants did not see fit, within their business judgment, to put any more money into expenditures in order to maintain Steve and Barry's as a going concern, which could more plausibly have been the most reasonable conclusion anyone could reach under the circumstances. Accordingly, they made a business decision to cease spending money on acquiring or managing inventory (whether for the Fall 2008 or Spring 2009 season) and incur no more borrowing obligations even as an alternative to the Abelco Loan or to supplement funds that would come from the liquidation of existing inventory.

Furthermore, there are explanations other than "bad faith" for the Bay Harbour and York Employee Defendants' alleged failure to engage a CFO and delay engaging a CEO "until it was too late to effect any meaningful management change prior to bankruptcy," and for removing Shore and Prevor from any management position; namely, the limited requirements of the DLLCA with respect to board meetings and the necessity of a board generally, and the fact that the Bay Harbour and York Principals did not desire to continue Steve & Barry's as a going concern.

Accordingly, even if the Bay Harbour and York Principals owed Holdings a duty of care that was not eliminated by the relevant Exculpatory Provisions, the Committee has failed to successfully allege, and cannot allege, that the Bay Harbour and York Principals breached that duty to Holdings, and to the extent the Committee alleges a breach of the fiduciary duty of care against the Bay Harbour and York Principals, that claim is dismissed with prejudice.

ii.      Duty of Loyalty[14]

"[T]he duty of loyalty mandates that the best interest of the corporation and its

shareholders takes precedence over any interest possessed by a director, officer or controlling

shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634

A.2d 345, 361 (Del. 1993); *Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb*,

385 F. Supp. 2d 449, 460 (D. Del. 2004).  "A breach of loyalty claim requires some form of self-

dealing or misuse of corporate office for personal gain."  *CVC Claims Litig. LLC.*, 2007 WL

2915181, at *3; *Joseph v. Frank (In re Troll Commc'ns)*, 385 B.R. 110, 118 (Bankr. D. Del.

2008) (same).

To allege a breach of the duty of loyalty, the Committee must "plead facts demonstrating

that a majority of a board that approved the transaction in dispute was interested and/or lacked

independence," which is similar to the showing required to demonstrate that directors are not

entitled to the protection of the business judgment rule presumption and the entire fairness

standard applies.  *See Edgecomb*, 385 F. Supp. 2d at 460 (citing *Orman v. Cullman*, 794 A.2d 5,

23 (Del. Ch. 2002)).

"The classic example that implicates the duty of loyalty is when a fiduciary either appears

on both sides of a transaction or receives a personal benefit not shared by all shareholders."  *CVC

Claims*, 2007 WL 2915181, at *3; *Edgecomb*, 385 F. Supp. 2d at 460 ("a director is considered

interested where he or she will receive a personal financial benefit from a transaction that is not

---

[14]   Although the Committee invokes the duty of good faith as separate from the duty of loyalty, under Delaware
law, the duty of loyalty is subsumed within the duty of good faith.  *See, e.g., Nagy v. Bistricer,* 770 A.2d 43, 49 n.2
(Del. Ch. 2000) (holding that "[i]f it is useful at all as an independent concept, the good faith iteration's utility may
rest in its constant reminder (1) that a fiduciary may act disloyally for a variety of reasons other than personal
pecuniary interest; and (2) that, regardless of his motive, a director who consciously disregards his duties to the
corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes");
*Continuing Creditors' Comm. of Star Telecommcn's, Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 460 (D. Del. 2004).

equally shared by the shareholders"). "In such circumstances, a director cannot be expected to exercise his or her independent business judgment without being influenced by the [favorable or] adverse personal consequences resulting from the decision." *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993). A claim for breach of fiduciary duty of loyalty requires an intentional act. *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d at 67 ("A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."). At the same time, it is an "unsupportable premise that a director who owns a lot of stock cannot cast a disinterested vote. . . . [S]tock ownership, coinciding with a Board decision that may affect the price of those shares, is [not] adequate to show a breach of the duty of loyalty." *Edgecomb*, 385 F. Supp. 2d at 460-61.

With respect to the breach of fiduciary duty of loyalty, the Complaint is similarly deficient. The only allegation in the Complaint that the Bay Harbour and York Employee Defendants breached their duties of loyalty to Holdings is contained in ¶ 73:

> [T]he Bay Harbour and York Board Members breached their duties of loyalty and good faith by directly intervening in the provinces of management, acting as CEO, failing to authorize necessary expenditure of monies, and instead operating the Debtor [Holdings] as an instrumentality of Bay Harbour and York, as set forth above, to the detriment of the Debtor and its creditors, and for the purposes of benefiting Bay Harbour and York.

(Compl. ¶ 73.) This allegation is conclusory and should be disregarded. As discussed *infra* with respect to the good faith element of overcoming the business judgment rule presumption, there are no allegations of specific facts that raise a plausible inference that Bay Harbour and York either sat on both sides of a transaction or received a benefit not shared by the other Holdings's members, especially since at all relevant times, Holdco or Intermediate Holdco was the only

member of Holdings.  Furthermore, there is no allegation of any "dishonest purpose or moral

obliquity" that would constitute bad faith.  The breach of fiduciary duty of loyalty claim must

therefore be dismissed.  In any event, because the Committee cannot pierce the corporate veil to

reach the Bay Harbour and York Employee Defendants, they cannot be found to owe fiduciary

obligations to Holdings.  Therefore, the cause of action against the Bay Harbour and York

Employee Defendants for breach of fiduciary duty is dismissed with prejudice.

### 3.    *Breach of Duty of Care by Sugarman and Todd*

The Committee alleges that Sugarman and Todd, Holdings's President and Chief

Operating Officer, breached their fiduciary duty of care to Holdings.  The Committee admits in

its opposition papers that it asserts these claims because it "feels duty bound" to do so, even

though it believes Sugarman and Todd "worked largely at the beck and call of Bay Harbour and

York."   In response, Sugarman and Todd first challenge the Committee's standing to bring this

cause of action against them, and secondly assert that they should be protected by the business

judgment rule.

### a.    Standing

Sugarman and Todd first challenge the Committee's standing to assert breach claims

against Holdings' former executives.  Sugarman and Todd contend that because the cause of

action is derivative in nature, the Committee must have been a creditor at the time it was

asserted, which it has not pled in the Complaint.  The Committee points to the Stipulation and

Order Concerning the Investigation, Assertion and Prosecution of Certain of the Debtor's

Claims, which provides that the Committee is authorized to investigate, assert, commence, and

prosecute any and all claims on behalf of the Debtors.  (ECF Doc. #286 ¶ 1.)  "The claim for

breach of fiduciary duty is derivative under Delaware law, and constitutes property of the estate

under 11 U.S.C. § 541." *Musicland*, 398 B.R. at 786.  The cause of action belongs to the

Committee and it has standing to assert it.[15]

> b.    The Committee Has Not Adequately Pled Breach of Fiduciary Duty of Care, even though Sugarman and Todd may owe Holdings a Fiduciary Duty of Care

In *Musicland*, Judge Bernstein pointed out that "[t]he Delaware Supreme Court has

indicated, in *dicta,* that the business judgment rule applies to officers *qua* officers to the same

extent as directors," and found that, particularly where both parties agreed, corporate officers

owed a fiduciary duty to their entity.   *Musicland*, 398 B.R. at 788 (citing *Cinerama, Inc. v.*

*Technicolor, Inc.,* 663 A.2d 1156, 1162 (Del.1995)).  Sugarman and Todd do not appear to

dispute that they would otherwise owe fiduciary duties to Holdings, except to contend that the

exculpatory provision in the Holdings' LLC Agreements results in them having no duty of care.

---

[15]    The Complaint here only asserts claims belonging to the Debtors; it does not purport to assert direct claims of the creditors.  Furthermore, though the Committee did not plead that Holdings was insolvent or in the "zone of insolvency" at the time of the alleged breaches of fiduciary duties, even if Holdings was insolvent or in the "zone of insolvency" at the time of the alleged breaches, creditors cannot bring direct (as opposed to derivative) claims for breach of fiduciary duties against the directors of a corporation.  *Gheewalla*, 930 A.2d at 94.  In *Gheewalla*, a creditor alleged that "at all relevant times, [entity] was either insolvent or in the 'zone of insolvency,' the Defendants [directors of entity employed by Goldman Sachs who served on the Board of Directors at the behest of Goldman Sachs] owed fiduciary duties to [the creditor] 'as a substantial creditor' of [entity], and the Defendants breached those duties by: (1): not preserving the assets of [entity] for its benefit and that of creditors when it became apparent that [entity] would not be able to continue as a going concern and would need to be liquidated and (2) holding on to [creditor's] license rights when [entity] would not use them, solely to keep Goldman Sachs's investment 'in play.'"  *Id.* at 95.  The court pointed out that "the general rule is that directors do not owe creditors duties beyond the relevant contractual terms.  *Id.* at 99 (internal quotation marks omitted.)  It went on to conclude: "[w]hen a solvent corporation is navigating in the zone of insolvency, the focus for Delaware directors does not change: directors must continue to discharge their fiduciary duties to the corporation and its shareholders by exercising their business judgment in the best interests of the corporation for the benefit of its shareholder owners," and, accordingly, found that the complaint failed to state a claim "to the extent that it attempts to assert a direct claim for breach of fiduciary duty to a creditor while [entity] was operating in the zone of insolvency."  *Id.* at 101.  Furthermore, it found that "[r]ecognizing that directors of an insolvent corporation owe direct fiduciary duties to creditors, would create uncertainty for directors who have a fiduciary duty to exercise their business judgment in the best interest of the insolvent corporation. . . .  [I]ndividual *creditors* of an *insolvent*  corporation have *no right to assert direct* claims for breach of fiduciary duty against corporate directors.  Creditors may nonetheless protect their interest by bringing derivative claims on behalf of the insolvent corporation or any *other* direct nonfiduciary claim . . . ."  *Id.* at 103 (emphasis in original).  Thus, while the Court concludes that the Committee has standing to assert the Debtors' claims against Sugarman and Todd, as explained in the next section, the Complaint fails to state claims against them for breach of the fiduciary duty of care.

However, there is no exculpatory provision in the original Holdings LLC Agreement, and, as with respect to the Bay Harbour and York Principals, the exculpatory provisions in the other Holdings LLC Agreements will not apply to "gross negligence." Accordingly, Sugarman and Todd may owe fiduciary duties to Holdings.

However, as with the claims against the Bay Harbour and York Employee Defendants, the Committee has failed to show how Sugarman's and Todd's conduct, even if as alleged is true, would give rise to liability for breaching their duties of care. The Committee has also failed to plead around the business judgment rule. The Committee alleges three principal failures on the part of Sugarman and Todd. First, it alleges that they should have known that there was no sound basis for assuming that inventory could be liquidated and did not plan for a possible shortfall. (Compl. ¶ 77(a).) Second, the Committee alleges that they failed to prepare a coherent plan for timely acquiring merchandise for Fall 2008 and to plan for the possibility that merchandise could be delayed. (*Id.* ¶ 77(b).) Third, the Committee alleges that they did not adequately plan for moving merchandise between liquidating and going-forward stores. (*Id.* ¶ 77(c).) For the same reasons discussed *supra* with respect to the Bay Harbour and York Employee Defendants, these allegations are all failures of business judgment, and do not overcome the presumption that Sugarman and Todd acted "(1) in good faith; (2) in the honest belief that the action was in the best interest of the corporation; or (3) on an informed basis." *See, e.g.*, *Crescent Mach I Partners L.P.*, 846 A.2d at 984; *CVC Claims Litigation LLC*, 2007 WL 2915181 at *3. Furthermore, in *Roselink Investors LLC*, the court noted that "given that Delaware law required defendants, as directors of a wholly-owned subsidiary, to consider the interests of the parent company, defendants would have been in breach of their fiduciary duties had they *not* considered the best interests of [the parent] in deciding whether to [take action]"

where creditors attempted to assert a cause of action for breaches of fiduciary duties. *Roselink Investors LLC*, 386 F. Supp. 2d at 219 n.3 (applying Delaware law). While Sugarman and Todd were officers of Holdings and not directors of its parent, they too cannot be faulted for following the directions of Holdings's managing member, at least so long as no self-dealing or violation of law was involved. *See Trenwick*, 906 A.2d at 201 ("Delaware law does not embrace the concept that a director of a wholly-owned subsidiary owes a duty to second-guess the business judgment of the parent corporation when following and supporting the parent's strategy would not violate any legal obligation the subsidiary owes to another.") The breach of fiduciary duty cause of action is therefore dismissed with prejudice against Sugarman and Todd.

### E.    Equitable Subordination and Recharacterization

Finally, the Committee alleges that the Finco loan should be equitably subordinated, or, in the alternative, recharacterized as an equity contribution. The Committee asserts the cause of action against Finco, Bay Harbour, York, Hilco, Shore, and Prevor. Bay Harbour, York, Shore, Prevor, and Hilco were investors in Holdco, who in turn directed $75 million to Finco. Finco in turn loaned the $75 million to Holdings as a second lien loan. It is this loan that the Committee seeks to subordinate or recharacterize as an equity contribution. The Committee alleges that the loan was a sham; that it represented the equity contributions of Bay Harbour, York, Hilco, Prevor, and Shore; that those parties understood that the purpose of the loan was to disguise the equity contributions; that Finco was not a lender; that there was no commercial negotiation, regular payments of principal, and no interest payments; that Bay Harbour, York, and their representatives effectively controlled Finco at the time of loan; and that by exercising such control, Bay Harbour and York acted as insiders. (Compl. ¶¶ 79-86.)

Even though the Committee asserts a single cause of action for both, equitable subordination and recharacterization are actually two separate causes of action. *See Adelphia Commc'ns Corp. v. Bank of America, N.A. (In re Adelphia Commc'ns Corp.)*, 365 B.R. 24, 74 (Bankr. S.D.N.Y. 2007) (Gerber, J.) ("*Adelphia*") ("[R]echaracterization and equitable subordination analyses differ from each other in that recharacterization analyses focus on the substance of the transaction, whereas equitable subordination analyses focus on the creditor's behavior."). Therefore, the Court will analyze the causes of action separately.

1. *Equitable Subordination and Recharacterization Claims Against Bay Harbour, York, Hilco, Shore, and Prevor*

As a threshold matter, equitable subordination and recharacterization require filing a proof of claim: "[i]f a creditor has not filed a claim, there is nothing to subordinate nor any case or controversy to resolve." *O'Connell v. Arthur Andersen LLP (In re Alphastar Ins. Group Ltd.)*, 383 B.R. 231, 276 (Bankr. S.D.N.Y. 2008) (Bernstein, C.J.)("*Alphastar*"); *Gold v. Winget (In re NM Holdings Co.)*, 2009 WL 1372982, at *45 (Bankr. E.D. Mich. May 18, 2009) (dismissing recharacterization and equitable subordination claims against defendants who did not file proofs of claim, because "there is no debt to recharacterize and no claim to subordinate"). Neither Bay Harbour, York, Shore, Prevor, nor Hilco filed proofs of claim here and the bar date has long since passed. Claims for equitable subordination or recharacterization cannot be sustained against them.

The Committee seems to concede this point, arguing only that they are necessary parties to the cause of action under Fed. R. Civ. P. 19(a) (made applicable to adversary proceedings by Fed. R. Bankr. P. 7019). (*See Hr'g Tr.* 158:25, Sept.8, 2009, ECF Doc. # 52.) Fed. R. Civ. P. 19(a)(1)(B) provides that required parties are those without whom "the court cannot accord

complete relief among existing parties" or those who "claim[] an interest relating to the subject

of the action and [who are] so situated that disposing of the action in the person's absence may:

(i) as a practical matter impair or impede the person's ability to protect the interest; or  (ii) leave

an existing party subject to a substantial risk of incurring double, multiple, or otherwise

inconsistent obligations because of the interest."  The Second Circuit has defined "indispensable

parties" as "all whose interests will be affected by the decree, that is, all persons materially

interested either legally or beneficially in the subject matter of the suit."  *Johnson v. Kay*, 860

F.2d 529, 539 (2d Cir. 1988) (internal citations omitted).

Bay Harbour, York, Hilco, Shore, and Prevor are not indispensable parties within the

meaning of Fed. R. Civ. P. 19(a).  Since Finco, Holdings, and Holdco were the only signatories

to the Finco loan, the court can grant complete relief without any additional parties.  *See Philips*

*Credit Corp. v. Three Cities FM Inc.*, 1993 WL 15460, at *3 (S.D.N.Y. Jan. 8, 1993) (declining

to hold as "necessary parties" corporation and its shareholders notwithstanding the fact that they

solicited and had an interest in the collateral securing the subject loans).  Furthermore, "[a]

person does not become indispensable to an action to determine rights under a contract simply

because that person's rights or obligations under an entirely separate contract will be affected by

the result of the action." *Id.* (citing *Helzberg's Diamond Shops, Inc. v. Valby West Des Moines*

*Shopping Ctr., Inc.*, 564 F.2d 816, 820 (8th Cir.1977) and *Shelton v. Exxon Corp.*, 843 F.2d 212,

218 (5th Cir.1988) ("Rule 19 does not contemplate joinder of any party who might possibly be

affected by a judgment")); *Irving Trust v. Braswell*, 596 F. Supp. 1441, 1443 (S.D.N.Y. 1984)

(holding that loan trustee was not indispensable party to a breach of contract action between two

lending parties).

Here, while Bay Harbour's, York's, Shore's, Prevor's, and Hilco's money ended up partially in the Finco loan, that loan was an entirely separate transaction. These individuals are not necessary parties for determining whether the loan should be subordinated or recharacterized. The Committee provides no authority for the proposition that passive investors a tier removed from a lending party are indispensable to a claim for equitable subordination or recharacterization and essentially conceded at oral argument that adding Bay Harbour, York, Shore, Prevor, and Hilco to the equitable subordination and recharacterization claims did not matter to it economically. (*Hr'g Tr.* 158:16-25, Sept.8, 2009, ECF Doc. # 52.) Accordingly, the equitable subordination and recharacterization claims against Shore, Prevor, York, Bay Harbour, and Hilco are dismissed with prejudice. The Court will therefore only analyze the equitable subordination and recharacterization claims against Finco.

> 2. *Equitable Subordination and Recharacterization claims against Finco*
>
> a.    Equitable Subordination against Finco

The Bankruptcy Code itself does not delineate the standard for equitable subordination under Bankruptcy Code § 510(c), which just permits a court to subordinate allowed claims "under principles of equitable subordination." 11 U.S.C. § 510(c)(1). Rather, courts look to the three factors set out by the Fifth Circuit in *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir. 1977): (1) the defendant engaged in inequitable conduct; (2) that conduct injured other creditors or conferred an unfair advantage on the defendant; and (3) subordination of the defendant's claim is not otherwise inconsistent with the Code. *See also Sure-Snap Corp. v. State Street Bank & Trust Co.*, 948 F.2d 869, 876 (2d Cir. 1991); *In re Enron Corp.*, 379 B.R. 425, 433 (S.D.N.Y. 2007) (Scheindlin, J.); *Sunbeam*, 284 B.R. at 363. "A bankruptcy court's general equitable power to adjust equities among creditors in relation to the liquidation results is

the source of the bankruptcy court's power to subordinate claims." *Sunbeam*, 284 B.R. at 363. The Court will evaluate each of these factors in turn.

i. Inequitable Conduct

To satisfy the first prong of the test, a court must find (1) fraud, illegality, or breach of fiduciary duty, (2) undercapitalization, or (3) control or use of the debtor as an alter ego for the benefit of the claimant. *See Alphastar*, 383 B.R. at 276; *Sunbeam*, 284 B.R. at 363 ("This is accomplished by permitting the court to subordinate an otherwise legally valid claim when the claimant has engaged in conduct that makes it unjust or unfair for the claimant to share pro rata with similarly situated creditors.").

When the defendant is an insider, his conduct is subject to greater scrutiny. *See Alphastar*, 383 B.R. at 276. Conversely, "[a] higher level of proof is required to equitably subordinate the claim of a party that is neither an insider of the debtor, nor a fiduciary to the debtor or other creditors." *Sunbeam*, 284 B.R. at 363-64. As a result, "[w]hen a non-insider or non-fiduciary is involved, courts have required that a claimant's conduct be egregious and severely unfair to other creditors before its claim will be equitably subordinated." *Id.* at 364. "The conduct required has been described as substantial misconduct tantamount to fraud, misrepresentation, overreaching or spoilation." *Id.* "Few cases find that non-insider, non-fiduciary claimants meet this standard." *Id.*

ii. Injury to Creditors or Unfair Advantage to the Claimant

The second prong requires a finding that the claimant's conduct injured the debtor or its creditors, or resulted in an unfair advantage to the claimant. Under this prong, "that claim is subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors

suffered on account of the inequitable conduct." *Id.* This sets the "limit of the remedy regardless of the nature of the claimant's conduct." *Id.*

iii. Not Inconsistent with the Bankruptcy Code

Finally, subordination cannot be inconsistent with the Bankruptcy Code. "This element recognizes that the doctrine is not a mechanism to be used by courts to alter the statutory scheme in an effort to reach a result the court considers more equitable than the distribution scheme provided for in the Bankruptcy Code." *Id.*

Application of these three factors is fact-intensive and so a motion to dismiss may not necessarily be granted, even where the defendants are non-insiders. *Adelphia*, 365 B.R. at 69. For example, in *Adelphia*, the court denied a motion to dismiss, because if the Committee's allegations were proven, it "could establish the requisite inequitable conduct, and meet the higher standards for doing so where the creditor whose claim is to be subordinated is not an insider." *Id.* Finco argues that because it is a non-insider, the subordination claim should be dismissed. Finco also argues that because the Committee has not pled that Finco engaged in inequitable conduct, the claim should also be dismissed. The Committee has failed to allege that Finco either (1) committed fraud, a breach of fiduciary duty, or any kind of illegality; (2) undercapitalized Holdings; or (3) used Holdings as an alter ego.[16] Furthermore, the Committee has not pled that Finco was an insider, though Finco conceded at oral argument that there is at least an "allegation that Finco itself was an insider." (*Hr'g Tr.* 76:5-6, Sept.8, 2009, ECF Doc. # 52.) The claim therefore must be dismissed. Nevertheless, just as in *Adelphia*, the Committee's allegations, if true, paint a picture of inequity that could give rise to liability on the part of Finco. The Court

---

[16]    All of the Committee's allegations regarding domination and control were with respect to Bay Harbour and York dominating Holdco and Holdings.

therefore dismisses the Committee's claim for equitable subordination against Finco, with leave to amend the Complaint within 30 days to plead that Finco engaged in inequitable conduct and was an insider.

> b.      Equitable Recharacterization against Finco

"Recharacterization is appropriate where the circumstances show that a debt transaction was actually an equity contribution *ab initio*." *Bayer Corp. v. MasoTech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 747-48 (6th Cir. 2001) (citing *In re Cold Harbor Assocs.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997)).  A claim to recharacterize debt as equity is different from a claim to equitably subordinate an allowed claim.  *See, e.g.*, *Adelphia*, 365 B.R. at 74 (noting that "recharacterization analyses focus on the substance of the *transaction*, whereas equitable subordination analysis focus on the *creditor's behavior*") (emphasis in original).  In contrast to equitable subordination, "[r]echaracterization claims turn on whether a debt actually exists—not on whether the claim should be equitably subordinated or disallowed." *Id.* at 73.  The "paradigmatic" recharacterization case involves a situation where "the same individuals or entities (or affiliates of such) control both the transferor and the transferee, and inferences can be drawn that funds were put into an enterprise with little or no expectation that they would be paid back along with other creditor claims." *Id.* at 74.[17]

Courts analyzing recharacterization claims balance the factors laid out by the Sixth Circuit in *Autostyle*, 269 F.3d at 749-50:  (1) the names given to the certificates evidencing the

---

[17]    There are some courts that have found that because the authority to recharacterize debt as equity is not found in the Code, the court lacks power to do so.  *See, e.g.*, *In re Pacific Express, Inc.*, 69 B.R. 112, 115 (9th Cir. BAP 1986); *In re Pinetree Partners, Ltd.*, 87 B.R. 481, 491 (Bankr. N.D. Ohio 1988).  These cases have largely not been followed, and courts in this jurisdiction and elsewhere have held that courts do have equitable power to recharacterize debt as equity where circumstances warrant it as part of the general authority under § 105(a) to "test the validity of debts." *Autostyle*, 269 F.3d at 748; *see also Adelphia*, 365 B.R. at 74 n.209 (rejecting the argument that bankruptcy courts lack power to recharacterize debt as equity).

indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) identity of interest between creditor and stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advance was used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments. While "[n]o one factor is controlling or decisive" and the court must consider the circumstances of each case, *id.* at 750, the court may dismiss a recharacterization claim if the plaintiff fails "to plead facts [that] trigger the applicability of the *Autostyle* factors, or a meaningful subset of them." *Adelphia*, 365 B.R. at 75.

With respect to the first factor, "[t]he issuance of a stock certificate indicates an equity contribution; the issuance of a bond, debenture, or note is indicative of a bona fide indebtedness." *Stinnett's Pontiac Serv., Inc. v. Commissioner*, 730 F.2d 634, 638 (11th Cir. 1984). With respect to the fourth factor, the source of repayments, "[i]f the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution." *Autostyle*, 269 F.3d at 751. In *Autostyle*, the bankruptcy court noted that the source of repayment was the borrower's earnings, secured by a lien on all of the assets, and found that this factor weighed in favor of recharacterization. *Id.* With respect to the sixth factor, the identity of interest between the creditor and the stockholder, the *Autostyle* court found "[i]f stockholders make advances in proportion to their respective stock ownership, an equity contribution is indicated." *Id.*

Furthermore, with respect to the seventh factor, the presence of a security for the loan is a strong indication of indebtedness. *Id.* at 752. Regarding the eighth factor, the corporation's ability to obtain financing from outside lenders, "[t]he fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans." *Id.* Under the tenth factor, if the funds were used to acquire capital assets, it takes on the character of an equity contribution. *Id.* Lastly, with respect to the eleventh factor, the presence or absence of a sinking fund, "[t]he failure to establish a sinking fund for repayment is evidence that the advances were capital contributions rather than loans." *Id.* at 753. If the loan is secured by a lien, however, there is no need for a sinking fund. *Id.*

Here, the Committee fails to plead, or simply cannot plead almost any of the *Autostyle* factors with respect to Finco.[18]

i.      The names given to the certificates evidencing the indebtedness

Finco and Holdings executed formal loan documents entitled "Subordinated Second Lien Financing Agreement."[19] Accordingly, under *Stinnett's Pontiac Serv., Inc. v. Commissioner* and *Autostyle*, the Committee cannot plead facts showing that this factor weighs in favor of recharacterization. *Autostyle*, 269 F.3d at 749-50; *Stinnett's Pontiac Serv., Inc.*, 730 F.2d at 638.

ii.     The presence or absence of a fixed maturity date and schedule of payments

The Finco Loan had a fixed maturity date: August 26, 2010. (*See* Financing Agreement § 1.01; § 2.03(a), Swanson Dec. Ex. 3 (outstanding principal due on the scheduled maturity date).)

---

[18]   While the Committee did not explicitly incorporate or rely on the Finco loan documents in its complaint, the Court should consider it in determining whether the Committee adequately pled the *Autostyle* factors. *See Food Mgmt*, 380 B.R. at 690.

[19]   The Finco Financing Agreement was attached as Exhibit 3 to the Swanson Dec., and the Finco Security Agreement is attached as Exhibit A to the Declaration of Owen L. Cyrulnik in support of Defendants Holdco and Finco's Motion to Dismiss the Complaint (hereinafter, "Cyrulnik Dec.").

Under *Autostyle*, the Committee cannot plead facts showing that this factor weighs in favor of recharacterization. *Autostyle*, 269 F.3d at 749-50.

     iii.     The presence or absence of a fixed rate of interest and interest payments

The loan had a fixed interest rate: 15%, with interest accruing and being capitalized on the first of each month.  (See Financing Agreement § 2.04(a), Swanson Dec. Ex. 3.)  The Committee cannot plead facts showing that this factor weighs in favor of recharacterization. *Autostyle*, 269 F.3d at 749-50.

     iv.     Source of repayments

Finco contends that since the loan was secured by Holdings's assets and was an independent obligation of Holdings, repayment did not depend on the success of the business. Still, these are the same facts that the Sixth Circuit in *Autostyle* found could be sufficient to recharacterize the debt as equity.  The Committee has adequately pled that the source of repayments was expected to be Holdings's earnings, and this weighs in favor of recharacterization.

     v.     The adequacy or inadequacy of capitalization

The analysis here is largely the same as under the piercing the corporate veil.  As noted *supra*, the Committee has not pled sufficient facts to demonstrate that Holdings was undercapitalized.  Courts should not put too much emphasis on this factor, in any event, because all companies in bankruptcy are in some sense undercapitalized.  *See In re Lifshultz Fast Freight*, 132 F.3d 339, 345 (7th Cir. 1997) ("Every firm in bankruptcy, and many outside, can in some sense be said to be undercapitalized.").  The Committee has not pleaded facts showing that this factor weighs in favor of recharacterization.

vi.     The identity of interest between the creditor and a stockholder

The Committee has not alleged that the loan from Finco was in proportion to Finco's

equity interest in Holdings; there was merely an allegation that "[a]ll of the $75,000,000

purportedly loaned by Finco to the Debtor represented the equity contributions of Bay Harbour,

York, Hilco, Prevor and Shore to Holdco," and "Bay Harbour, York, Hilco, Prevor and Shore all

understood that the purpose of the Finco Loan was to disguise 75% of their equity contributions

as a second lien loan."  (Compl. ¶¶ 81, 83.)  Accordingly, the Committee fails to plead facts

showing that this factor weighs in favor of recharacterization.  *Autostyle*, 269 F.3d at 751.  Even

if the Committee could plead such facts in an amended complaint, the Court would still conclude

that the Committee had not alleged a meaningful subset of the *Autostyle* factors.

vii.     The security, if any, for the advances

Here, the loan was secured by, among other things, Accounts, Books, Inventory, money,

and Cash and Cash Equivalents; thus, there is a strong indication of indebtedness.  (Cryrulnik

Dec., Ex. A at  ¶ 2.)  *See Autostyle*, 269 F.3d at 752.  The Committee cannot plead facts showing

that this factor weighs in favor of recharacterization.

viii.     The corporation's ability to obtain financing from outside lending institutions

The Committee has alleged that Holdings was unable to obtain financing from any other

source.  (Compl. ¶ 84.)  The allegation is conclusory, however, and is belied by the rest of the

Complaint, specifically by the fact that Holdings obtained the Abelco Loan at the same time.

The Committee cannot plead facts showing that this factor weighs in favor of recharacterization.

  ix. The extent to which the advances were subordinated to the claims of outside creditors

  The Finco Loan was junior to the Abelco Loan, but was senior to the claims of other creditors.  This weighs in favor of a finding of indebtedness.  The Committee cannot plead facts showing that this factor weighs in favor of recharacterization.

  x. The extent to which the advance was used to acquire capital assets

  Here, the Complaint alleges that Holdings used the funds to purchase inventory and to maintain cash reserves.  (Compl. ¶ 42.)  The Committee cannot plead facts showing that this factor weighs in favor of recharacterization.  *Autostyle*, 269 F.3d at 752.

  xi. The presence or absence of a sinking fund to provide repayments

  This factor is irrelevant.  *Autostyle*, 269 F.3d at 753.

  In all, the Committee has pled facts supporting one of the *Autostyle* factors, the source of repayments factor.  This is not a "meaningful subset" of the *Autostyle* factors that could survive a motion to dismiss.  *Adelphia*, 365 B.R. at 75.  Furthermore, in almost all of these factors, the Committee cannot plead facts that would support recharacterization, because the loan documents or the Complaint contradict any amended allegation.  The recharacterization claim against Finco is therefore dismissed with prejudice.

### CONCLUSION

  For the reasons discussed above, the Court dismisses with prejudice the piercing the corporate veil claim against the Bay Harbour and York Defendants, as well as against Teitelbaum, Sozio, Medeiros and Dinan.  The Court also dismisses with prejudice the breach of the fiduciary duties of care and loyalty against Holdco, Teitelbaum, Sozio, Medeiros and Dinan with prejudice, as well as the breach of the fiduciary duty of care claims against Todd and Sugarman.  In addition, the equitable recharacterization claims against Finco, Shore, Prevor,

York, Bay Harbour, and Hilco, and the subordination claims against Shore, Prevor, York, Bay

Harbour and Hilco, are dismissed with prejudice.  However, the Court dismisses the

Committee's claim for equitable subordination against Finco without prejudice, with leave to

amend the Complaint within 30 days.

**IT IS SO ORDERED.**

Dated:    New York, New York
          November 24, 2009

                                        _____
                                                /s/ **Martin Glenn**
                                        HONORABLE MARTIN GLENN
                                        UNITED STATES BANKRUPTCY JUDGE